Jeffrey I. Carton (JC-8296)
Joanna Sandolo (JS-9187)
DENLEA & CARTON LLP
One N. Broadway, 5th Floor
White Plains, NY 10601
(914) 920-7400
*Attorneys for Plaintiff Ryan J. Negri*

DEC 31 2014

14 CV 10233

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
RYAN J. NEGRI,

JUDGE WOODS

                Plaintiff,         Civil Action No.

    -against-

                           **COMPLAINT**

MICHAEL J. FRIEDMAN, ARTHUR
FRIEDMAN and P.J. LOUIS,

                Defendants.
------------------------------------------------------------------X

    Plaintiff, Ryan J. Negri ("Plaintiff" or "Negri"), by and through his undersigned attorneys, as and for his Complaint against defendants Michael J. Friedman ("Friedman"), Arthur Friedman ("Arthur Friedman") and P.J. Louis ("Louis") (together, "Defendants"), alleges as follows:

### NATURE OF THE ACTION

    1.    This action seeks to redress the blatant and duplicitous scheme perpetuated by Defendants Friedman, Arthur Friedman and Louis by which Defendants induced Plaintiff to sell his profitable consumer-electronics business, Negri Electronics, Inc. (the "Company"), all the while intending: (i) to strip the company of its assets, (ii) to renege on $6 million in payments due to Plaintiff, and (iii) to leave Plaintiff with the

skeletal shell of a business (and its liabilities) which Defendants plundered.

2. Specifically, defendant Friedman, through false representations of both his ability and intent to perform under the parties' Stock Purchase Agreement (the "Agreement"), induced Plaintiff to sell all of his outstanding common shares in the Company to Friedman's business entity First Ascent, LLC ("First Ascent") for the aggregate sale price of $7,212,817.

3. Almost immediately thereafter, defendants Friedman and Louis began to loot the Company of its assets, withdrawing cash for their personal use and to pay off, *inter alia*, Friedman's indebtedness to his father, Arthur Friedman.

4. Further, in March 2014, Friedman further induced Plaintiff to agree to subordinate his rights to the collateral securing the Agreement to the rights of a hard-money lender providing a line of credit to the Company. In doing so, Friedman promised to accelerate the schedule of the remaining payments due to Plaintiff under the Agreement.

5. In fact, Friedman never intended to satisfy his payment obligations to Plaintiff. Rather, Friedman sought to gain control of the Company so that he could wring whatever cash he and Louis could out of it, and then walk away, leaving Plaintiff with worthless shares and an irrevocably damaged reputation.

6. As a result of this misconduct, Plaintiff has suffered damages in excess of $6 million, and brings this action seeking recompense for Defendants' deceit.

### PARTIES

7. Plaintiff Ryan J. Negri is a highly successful tech entrepreneur and investor, and founder of the Company. Ryan J. Negri is a resident of Las Vegas,

Nevada.

8. Upon information and belief, defendant Friedman is an attorney, entrepreneur, founder and owner of multiple companies. Defendant Friedman is a resident of New York, New York.

9. Upon information and belief, defendant Arthur Friedman is an accountant and the father of Friedman. Defendant Arthur Friedman is a resident of New York, New York.

10. Upon information and belief, defendant Louis is a veteran of the telecommunications industry, who specializes in the restructuring and turnaround of telecom, technology and media companies. Defendant Louis is a resident of Westchester County, New York.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

12. This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b), in that the Defendants reside in this District.

## FACTS

**Background**

13. Plaintiff is an entrepreneur, philanthropist and investor focusing in technology and telecommunications. In or about June 2006, Plaintiff created the Company, then under the name Negri Investments. Plaintiff wholly self-funded the

3

Company without the involvement of any outside investors.

14. Over the course of the next 7-plus years, Plaintiff grew the Company into the largest independent seller of unlocked phones in the United States, with close to $18 million in gross revenue in 2013.

15. Beginning in or around early 2012, in order to continue to grow the business, Plaintiff began to look for outside investors.

**Plaintiff's Negotiations With Friedman**

16. At or about the same time, Plaintiff made the acquaintance of Todd Sherman, an investment banker in New York, New York ("Sherman") through a mutual friend. At the time, Sherman was in the process of leaving his firm and thus Plaintiff did not formally retain his firm's investment banking services.

17. Rather, Plaintiff and Sherman agreed that Sherman would receive 3% of any investment in the Company.

18. Shortly thereafter, in or about October 2013, Sherman introduced Plaintiff to Michael Friedman. Sherman represented that he had "pre-qualified" Friedman as an investor. Friedman himself represented that he was the founder, owner and operator of multiple companies, and that he had acquired and successfully run businesses such as the Company "many times."

19. By telephone call on or about October 14, 2013, Plaintiff discussed the Company and his objectives with Friedman. Friedman expressed an interest in acquiring the Company, and further expressed his financial wherewithal to proceed with such acquisition.

20. On or about October 16, 2013, Friedman sent Plaintiff a Non-Disclosure

Agreement, which Plaintiff promptly signed and returned.

21. As the parties continued to negotiate and Plaintiff continued to provide Friedman, through Sherman, with information about the Company, Friedman's overtures focused solely upon an acquisition of the Company, rather than an investment.

22. To that end, on or about November 13, 2013, Friedman sent Plaintiff a proposal whereby First Ascent would acquire the Company for approximately $4 to $4.5 million, payable over two to four years. Under either scenario, payments were subject to increase based upon revenue and profitability targets.

23. Ultimately, the parties did not reach an agreement on these terms. Rather, on or about November 26, 2013, the parties entered into a Term Sheet (the "Term Sheet") for the acquisition of the Company by First Ascent for a purchase price of $7,050,000 (plus a percentage of the closing balance of the operating account), payable over four years. Because Friedman was anxious to close the deal by the end of 2013, the Term Sheet included a closing date of December 30, 2013.

24. In the following weeks, the parties continued to discuss the acquisition, and Plaintiff provided Friedman with any and all due diligence materials he requested.

25. Indeed, on or about December 16, 2013, Friedman, Louis and Sherman all flew from New York to Nevada to meet with Plaintiff and his employees and view the Company's Nevada offices.

26. During the course of this two-day meeting, Friedman and Louis both described the "hands on" approach they intended to take in running the Company. Specifically, Louis represented that he would be physically present in the Company's

5

Nevada offices on a weekly basis, returning to his home in New York on the weekends.

27. Additionally, the parties discussed the Company's open balances, credits due to vendors, pending lawsuits and balance due to Plaintiff. Plaintiff further provided Friedman and Sherman with access to all of the Company's records and bank statements.

28. Further, Plaintiff and Friedman discussed personal guarantees made by Plaintiff on certain of the Company's obligations, such as the Company's leases with Olen Commercial Realty Corp. ("Olen") for its California offices. Friedman agreed that following the acquisition he would execute personal guarantees on such obligations to replace Plaintiff's guarantees.

**The Parties Enter Into The Agreement**

29. Following this due diligence, on or about December 24, 2013, Friedman, on behalf of First Ascent, Plaintiff and Philip Negri, the only other shareholder in the Company (with an ownership interest of 10%), entered into a Stock Purchase Agreement (the "Agreement") for the sale of the Company to First Ascent.

30. The Agreement provides, in relevant part, that First Ascent would acquire all outstanding stock in the Company for a purchase price of $7,212,819.34, payable over four years.

31. As security for the transaction, the Agreement provides:

**Section 2. Security Interest**. This Note shall be secured by the following:
(a) forty-percent (40%) of the accounts receivable of the Company;
(b) forty-percent (40%) of the inventory of the Company;
(c) upon the obtaining of a bank or financial Line of Credit ("LOC") the Company shall keep LOC funds available of up to:
    (i) the maximum value of the forward twelve (12) months of Payments to be made or received by Sellers; or

(ii) forty-percent (40%) of the total capital available in the LOC up to a maximum value of the forward twelve (12) months of Payments to be received by Sellers.

If Purchaser does not secure an LOC within six (6) months of the Closing Date that covers the forward (12) months of Payments, then Michael Friedman shall show proof of funds for the difference between the value of the LOC, if any, and the remaining Payments due over the remaining years payments.

**Additional Security Interest.** The Shares purchased by Purchaser shall be pledged as collateral securing the purchaser's obligations under this Agreement, subject to the Pledge Agreement entered contemporaneously with this Agreement. If the Purchaser Defaults and fails to cure during the Cure Period, then the Seller has the option of:
  (a) Extending the Cure Period at the Seller's sole discretion; or
  (b) Assuming majority control over the Shares Company (that are pledged as collateral pursuant to this Section and the Pledge Agreement). . . If the Seller obtains control and the Company has established an LOC, then Seller shall take on the debt of the LOC, provided that any debt under the LOC was strictly used for normal business practices and expenses. If Seller obtains control of the Company, then Purchaser shall be responsible for all other debt or liabilities not included or listed herein.

32. Under the payment schedule set forth in the Agreement, the sellers received approximately $500,000 at closing. As the 87% shareholder, Plaintiff received the majority of those funds.

33. Payments for the first calendar year thereafter (2014) were to be made as follows:

```
Year 1 Payments:
Q1 (1/3 paid at the end of each month)
    Month 1               1/23/2014         25,000
    Month 2               2/23/2014         25,000
    Month 3               4/1/2014          20,000
Total Q1 2014 Payments
            Q2    7/1/2014                 215,000
            Q3    10/1/2014                325,000
            Q4    12/31/2014               275,000
```

34. Additionally, the sellers were to receive: (1) $1,975,000 paid in equal quarterly installments during 2015; (2) 1,975,000 paid in equal quarterly installments during 2016; and (3) $1,875,000 paid in equal quarterly installments during 2017.

35. The Agreement and the accompanying payments were personally guaranteed by Michael Friedman.

**Defendants' Misuse Of The Company's Assets**

36. While Plaintiff did receive the money due to him at closing, the remaining payments were quickly derailed by Friedman and Louis' looting of the Company's assets.

37. Indeed, within a week of obtaining control of the Company, Friedman and Louis began withdrawing large sums of cash from the Company's operating account. Specifically, financial records reflect cash withdrawals immediately following closing as set forth below:

| Date | Type | Amount |
|---|---|---|
| 1/03/14 | Withdrawal | $20,000 |
| 1/09/14 | Wire to "Shareholder" | $87,000 |
| 1/13/14 | Withdrawal | $1,000 |
| 1/16/14 | Withdrawal | $5,000 |
| 1/17/14 | ATM Withdrawal | $9,500 |
| 1/27/14 | Travel (PJ Louis) | $5,000 |
| 1/27/14 | ATM Withdrawals | $900 |
| 1/27/14 | "Owners travel" | $9,500 |

38. These withdrawals, which could not have been made for any legitimate purpose as the Company did not pay any of its vendors or suppliers in cash, totaled over $137,900 in January 2014 alone.

39. Upon information and belief, the "Shareholder" to whom the $87,000 wire

8

transfer was made on January 9, 2014 was Michael Friedman's father, Arthur Friedman, who was never, in fact, a shareholder of the Company.

40. Further, throughout February and March, 2014, Defendants continued to make regular ATM withdrawals in the amount of $300 from the Company's operating account, as well as cash withdrawals of $12,000 and $1,670 on February 2, 2014 and $1,100 and $1,228.66 on March 18 and March 31, respectively.

**The First Amendment To The Stock Purchase Agreement**

41. On or about March 31, 2014, the Company, Friedman, Plaintiff and Philip Negri entered into a First Amendment to Stock Purchase Agreement (the "Amendment"). Friedman represented to Plaintiff that the Amendment was necessary in order to obtain the letter of credit ("LOC") referenced in the Agreement.

42. The Amendment required Plaintiff to subordinate his rights under the Agreement to TCA Global Fund ("TCA"), who would provide the LOC.

43. In order to induce Plaintiff into signing the Amendment and subordinating his interest in the collateral of the Company to TCA, Friedman agreed to advance the payment schedule set forth in the Agreement. Under the Amendment, remaining 2014 payments were to be made as follows:

| | | |
|---|---|---|
| Q2 | 7/1/2014 | 250,000 |
| Q3 | 10/1/2014 | 325,000 |
| Q4 | 12/31/2014 | 300,000 |

44. Additionally, payment of the balance of the purchase price was accelerated to be completed by the close of 2016, as opposed to 2017 as originally agreed. Thus, quarterly payments totaling $2,470,000 are due to be made in 2015 and quarterly payments totaling $3,295,000 are due to be made during 2016.

9

45. Further, the Amendment requires Friedman to obtain and provide to Plaintiff and Philip Negri standby letters of credit drawn on one or more bank accounts maintained by Friedman or entities that he owns or controls, in an amount equal to the balance owed to TCA.

46. However, while the Company received in excess of $300,000 from TCA under the LOC, no such standby letters of credit were ever provided to Plaintiff.

47. Likewise, although the Agreement requires Friedman, within six (6) months of the December 24, 2013, to secure a letter of credit covering the forward twelve months of payments due to Plaintiff, or to show proof of funds for the difference between the value of a letter of credit and the remaining payments due to Plaintiff, no such proof of funds was ever provided to Plaintiff.

**The Collapse Of The Company**

48. At the same time, the Company's business began to flounder. Although he had been withdrawing cash, Friedman failed to pay the operating costs of the business, including payments due to vendors, utilities and rent for the Company's offices and, ultimately, employees' salaries.

49. Likewise, Friedman and Louis failed to take any active role in managing the Company. Despite their promises of "hands on" management, Friedman never stepped foot inside the Company's Nevada headquarters following the sale, and Louis only visited a handful of times between January and July, 2014.

50. As a result, the Company quickly became insolvent.

51. Moreover, Plaintiff came to learn that Friedman had failed to fulfill his agreement to replace Plaintiff's personal guarantees with guarantees of his own.

Accordingly, the Company's creditors began to look to Plaintiff to satisfy debts of the Company that Friedman had failed to pay. For example, Olen served Plaintiff with a notice of default of the Company's rent payments due under its leases with Olen. Olen has threatened to bring legal action against Plaintiff for this outstanding debt.

52. Ultimately, Friedman defaulted and failed to pay Plaintiff the July 1, 2014 payment due under the Amendment. Such default constitutes not only a breach of the Agreement, but also a default under the loan agreements between the Company and TCA.

53. Accordingly, TCA has served Friedman with a notice of default and taken control of the Company's assets.

54. Due to Friedman's flagrant mismanagement of the Company, vendor and client relationships have been destroyed, and the Company's reputation and goodwill have been eroded beyond repair. Indeed, in just seven months Friedman destroyed the Company it took Plaintiff seven years to build. The Company's remaining assets are insufficient to satisfy its outstanding obligations to TCA.

55. As a result of Friedman's misconduct, Plaintiff's right to recover the shares of the Company is valueless. Plaintiff has been left with nothing but the Company's debts and a damaged reputation. Accordingly, Plaintiff brings this action to rectify this shameless course of conduct and to recover the significant damages caused by Defendants' underhanded actions.

## COUNT I
## Fraudulent Misrepresentation
## (Against Michael J. Friedman)

56. Plaintiff repeats and realleges each of the allegations contained in paragraphs "1" through "55" above, as if fully set forth herein.

57. Beginning in 2013, Friedman undertook a calculated scheme to take control of Plaintiff's then-profitable Company, strip it of assets and then walk away, leaving Plaintiff to deal with the Company's debts incurred under Friedman's management.

58. In furtherance of this scheme, Friedman entered into an Agreement with Plaintiff pursuant to which Friedman's company, First Ascent, would acquire all of the outstanding common stock in the Company for a sale price in excess of $7 million.

59. In fact, Friedman never intended to honor the Agreement or to satisfy the payment obligations set forth therein.

60. Moreover, Friedman further induced Plaintiff into amending the Agreement and subordinating his rights to TCA, with the false promise of accelerated payments of the balance of the purchase price due to Plaintiff.

61. Again, Friedman never intended to comply with the payment schedule set forth in the Amendment, but rather sought to obtain an additional infusion of capital into the Company, which he would then withdraw for his own purposes.

62. Plaintiff reasonably relied on Friedman's misrepresentations by entering into both the Agreement and the Amendment, conveying his shares to Friedman and subordinating his rights to the Company's assets to TCA.

63. Ultimately, however, Friedman's true intent became apparent. Once he

gained control of the Company, he began to help himself to its cash all while defaulting on obligations to the Company's vendors and other creditors, quickly rendering the Company insolvent.

64. These actions clearly evidence that Friedman never intended to actively manage the Company or to satisfy his payment obligations to Plaintiff, but rather to wring whatever funds possible from it and then walk away, leaving Plaintiff with nothing.

65. As a result of Friedman's misconduct, Plaintiff has suffered both the devastating loss of his Company and irreparable harm to his name and reputation.

### COUNT II
### Unjust Enrichment
### (Against Michael J. Friedman and P.J. Louis)

66. Plaintiff repeats and realleges each of the allegations contained in paragraphs "1" through "65" above, as if fully set forth herein.

67. Beginning in January 2014, almost immediately upon taking control of the Company, defendants Michael Friedman and Louis began to withdraw cash from the Company's operating account for their own personal use.

68. The sums withdrawn amounted to over $137,000 in January alone.

69. These withdrawals damaged the Company and decreased the value of its stock, which Plaintiff is entitled to recover under the terms of the Agreement.

70. Under the circumstances, equity and good conscience require restitution.

### COUNT III
### Unjust Enrichment
### (Against Arthur Friedman)

71. Plaintiff repeats and realleges each of the allegations contained in paragraphs "1" through "70" above, as if fully set forth herein.

72. Upon information and belief, on or about January 9, 2014, Friedman transferred, via wire transfer, $87,000 of the Company's funds to Arthur Friedman to satisfy a personal obligation unrelated to the operation of the Company.

73. This transfer damaged the Company and decreased the value of its stock, which Plaintiff is entitled to recover under the terms of the Agreement.

74. Under the circumstances, equity and good conscience require restitution.

### COUNT IV
### Breach of Contract
### (Against Michael J. Friedman)

75. Plaintiff repeats and realleges each of the allegations contained in paragraphs "1" through "74" above, as if fully set forth herein.

76. On or about December 24, 2013, the parties entered into the Agreement, pursuant to which Friedman personally guaranteed all payment obligations due to Plaintiff.

77. Plaintiff performed all of his obligations under the Agreement.

78. Friedman has failed to make payments due to Plaintiff under the Agreement (and the Amendment) in the amount of $6,022,902.91.

79. Friedman's breach has resulted in damages to Plaintiff.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ryan J. Negri requests judgment against Defendants Michael J. Friedman, Arthur Friedman and P.J. Louis as follows:

A. On Count I, awarding Plaintiff punitive and compensatory damages in an amount to be determined at trial;

B. On Count II, awarding Plaintiff damages in an amount to be determined at

trial;

C. On Count III, awarding Plaintiff damages in the amount of $87,000, plus interest thereon;

D. On Count IV, awarding Plaintiff damages in an amount to be determined at trial; and

E. Granting such other relief as the Court deems just and proper, together with interest, attorneys' fees, costs and disbursements incurred in connection with this action.

A JURY TRIAL IS DEMANDED.

Dated:  White Plains, NY
December 31, 2014

DENLEA & CARTON LLP

By: _____
Jeffrey I. Carton (JC-8296)
Joanna Sandolo (JS-9187)
One N. Broadway, 5th Floor
White Plains, NY 10601
(914) 920-7400
*Attorneys for Plaintiff Ryan J. Negri*