Jeffrey I. Carton (JC-8296)
Joanna Sandolo (JS-9187)
DENLEA & CARTON LLP
2 Westchester Park Drive, Suite 410
White Plains, NY 10604
(914) 331-0100
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RYAN J. NEGRI and PHILIP NEGRI,

                       Plaintiffs,        Civil Action No.
                                                     14-cv-10233 (GHW)
    -against-
                                                   **AMENDED**
MICHAEL J. FRIEDMAN, ARTHUR        **COMPLAINT**
FRIEDMAN, FIRST ASCENT, LLC,
and P.J. LOUIS,

                       Defendants.
-------------------------------------------------------------------X

      Plaintiffs, Ryan J. Negri and Philip Negri (together, "Plaintiffs"), by and through their undersigned attorneys, as and for their Amended Complaint against defendants Michael J. Friedman ("Friedman"), Arthur Friedman ("Arthur Friedman"), First Ascent, LLC ("First Ascent") and P.J. (Paxton) Louis ("Louis") (together, "Defendants"), allege as follows:

## NATURE OF THE ACTION

      1.    This action seeks to redress the blatant and duplicitous scheme perpetrated by Defendants Friedman, Arthur Friedman, First Ascent and Louis by which Defendants induced Plaintiffs to sell their profitable consumer-electronics business, Negri Electronics, Inc. (the "Company") to First Ascent, all the while intending: (i) to strip

the company of its assets, (ii) to renege on $6 million in payments due to Plaintiffs, and (iii) to leave Plaintiffs with the charred remains of a business (and its liabilities) which Defendants plundered.

2. Specifically, defendant Friedman, through false representations of both his ability and intent to perform under the parties' Stock Purchase Agreement (the "Agreement"), induced Plaintiffs to sell all of their outstanding common shares in the Company to First Ascent for the aggregate sale price of $7,212,817.  This purchase price was personally guaranteed by Friedman.

3. Almost immediately thereafter, defendant Friedman began to loot the Company of its assets, withdrawing cash for his personal use and to pay off, *inter alia*, Friedman's unrelated indebtedness to his father, Arthur Friedman.

4. Upon information and belief, at or around the same time, defendant Friedman transferred _all_ of his assets to his father, so as to effectively render himself judgment-proof and his personal guarantee worthless.

5. In March of 2014, Friedman further induced Plaintiffs to agree to subordinate their rights to the collateral securing the Agreement to the rights of a hard-money lender providing a line of credit to the Company.  In doing so, Friedman falsely promised to accelerate the schedule of the remaining payments due to Plaintiffs under the Agreement.

6. In fact, Friedman never intended to satisfy his payment obligations to Plaintiffs.  Rather, Friedman sought to gain control of the Company so that he could wring whatever cash he could out of it, and then walk away, leaving Plaintiffs with worthless shares and an irrevocably damaged reputation.

7. As a result of this misconduct, Plaintiffs have suffered damages in excess of $6 million, and bring this action seeking recompense for Defendants' deceit.

## PARTIES

8. Plaintiff Ryan J. Negri is a highly successful tech entrepreneur and investor, and founder of the Company. Ryan J. Negri is a resident of Las Vegas, Nevada.

9. Plaintiff Philip Negri is the former Vice President of Operations of the Company. Philip Negri is a resident of Chicago, Illinois.

10. Upon information and belief, defendant Friedman is an attorney, entrepreneur, founder and owner of multiple companies. Defendant Friedman is a resident of New York, New York.

11. Upon information and belief, defendant Arthur Friedman is an attorney, accountant and the father of Friedman. Defendant Arthur Friedman is a resident of New York, New York.

12. Upon information and belief, defendant Louis is a veteran of the telecommunications industry, who specializes in the restructuring and turnaround of telecom, technology and media companies. Defendant Louis is a resident of Westchester County, New York.

13. Upon information and belief, defendant First Ascent is a Delaware limited liability company, having its principal place of business at 280 Madison Avenue, New York, New York 10016. Defendants Friedman and Arthur Friedman are the owners of First Ascent.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

15. This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b), in that the individual Defendants reside in this District, and defendant First Ascent has its principal place of business within this District.

**FACTS**

<u>Background</u>

16. Ryan Negri ("Negri") is an entrepreneur, philanthropist and investor focusing in technology and telecommunications. In or about June 2006, Negri founded the Company, then under the name Negri Investments. Negri wholly self-funded the Company without the involvement of any outside investors.

17. Over the course of the next 7-plus years, Negri grew the Company into the largest independent seller of unlocked phones in the United States, with close to $18 million in gross revenue in 2013.

18. Beginning in or around early 2012, in order to continue to grow the business, Plaintiff began to look for outside investors.

19. In or about June 2012, Philip Negri joined the Company as Vice President of Operations.

<u>Plaintiffs' Negotiations With Friedman</u>

20. At or about the same time, Plaintiffs made the acquaintance of Todd

Sherman, an investment banker in New York, New York ("Sherman") through a mutual friend. At the time, Sherman was in the process of leaving his firm and thus Plaintiffs did not formally retain his firm's investment banking services.

21. Rather, Plaintiffs and Sherman agreed that Sherman would receive 3% of any investment in the Company, although Sherman never owned any shares in the Company.

22. Shortly thereafter, in or about October 2013, Sherman introduced Negri to Michael Friedman. Sherman represented that he had "pre-qualified" Friedman as an investor. Friedman himself represented that he was the founder, owner and operator of multiple companies, and that he had acquired and successfully run businesses such as the Company "many times."

23. By telephone call on or about October 14, 2013, Negri discussed the Company and his objectives with Friedman. Friedman expressed an interest in acquiring the Company, and further expressed his financial wherewithal to proceed with such acquisition.

24. On or about October 16, 2013, Friedman sent Plaintiffs a Non-Disclosure Agreement, which Plaintiffs promptly signed and returned.

25. As the parties continued to negotiate and Negri continued to provide Friedman, through Sherman, with information about the Company, Friedman's overtures focused solely upon an acquisition of the Company, rather than an investment.

26. To that end, on or about November 13, 2013, Friedman sent Plaintiffs a proposal whereby First Ascent would acquire the Company for approximately $4 to $4.5

million, payable over two to four years.  Under either scenario, payments were subject to increase based upon revenue and profitability targets.

27.     Ultimately, the parties did not reach an agreement on these terms. Rather, on or about November 26, 2013, the parties entered into a Term Sheet (the "Term Sheet") for the acquisition of the Company by First Ascent for a purchase price of $7,050,000 (plus a percentage of the closing balance of the operating account), payable over four years.  Because Friedman was anxious to close the deal by the end of 2013, the Term Sheet included a closing date of December 30, 2013.

28.     In the following weeks, the parties continued to discuss the acquisition, and Plaintiffs provided Friedman with any and all due diligence materials he requested.

29.     Indeed, on or about December 16, 2013, Friedman, Louis and Sherman all flew from New York to Nevada to meet with Negri, Philip Negri and the Company's employees and view the Company's Nevada offices.

30.     During the course of this two-day meeting, Friedman and Louis both described the "hands on" approach they intended to take in running the Company. Specifically, Louis represented that he would be physically present in the Company's Nevada offices on a weekly basis, returning to his home in New York on the weekends.

31.     Additionally, the parties discussed the Company's open balances, credits due to vendors, pending lawsuits and balance due to Negri.  Plaintiffs further provided Friedman and Sherman with access to all of the Company's records and bank statements.

32.     Further, Negri and Friedman discussed personal guarantees made by Negri on certain of the Company's obligations, such as the Company's leases with Olen

Commercial Realty Corp. ("Olen") for its California offices. Friedman agreed that following the acquisition he would execute personal guarantees on such obligations to replace Negri's guarantees.

**The Parties Enter Into The Agreement**

33. Following this due diligence, on or about December 24, 2013, Friedman, on behalf of First Ascent, and Plaintiffs entered into a Stock Purchase Agreement (the "Agreement") for the sale of the Company to First Ascent.

34. The Agreement provides, in relevant part, that First Ascent would acquire all outstanding stock in the Company for a purchase price of $7,212,819.34, payable over four years.

35. As security for the transaction, the Agreement provides:

> **Section 2. Security Interest**. This Note shall be secured by the following:
> (a) forty-percent (40%) of the accounts receivable of the Company;
> (b) forty-percent (40%) of the inventory of the Company;
> (c) upon the obtaining of a bank or financial Line of Credit ("LOC") the Company shall keep LOC funds available of up to:
>      (i) the maximum value of the forward twelve (12) months of Payments to be made or received by Sellers; or
>      (ii) forty-percent (40%) of the total capital available in the LOC up to a maximum value of the forward twelve (12) months of Payments to be received by Sellers.
>
> If Purchaser does not secure an LOC within six (6) months of the Closing Date that covers the forward (12) months of Payments, then Michael Friedman shall show proof of funds for the difference between the value of the LOC, if any, and the remaining Payments due over the remaining years payments.
>
> **Additional Security Interest.** The Shares purchased by Purchaser shall be pledged as collateral securing the purchaser's obligations under this Agreement, subject to the Pledge Agreement entered contemporaneously with this Agreement. If the Purchaser Defaults and fails to cure during the Cure Period, then the Seller has the option of:
>      (a) Extending the Cure Period at the Seller's sole discretion; or

    (b) Assuming majority control over the Shares Company (that are pledged as collateral pursuant to this Section and the Pledge Agreement). . . If the Seller obtains control and the Company has established an LOC, then Seller shall take on the debt of the LOC, provided that any debt under the LOC was strictly used for normal business practices and expenses.  If Seller obtains control of the Company, then Purchaser shall be responsible for all other debt or liabilities not included or listed herein.

36.    Under the payment schedule set forth in the Agreement, the sellers received approximately $500,000 in "Closing Funds" at closing.  These Closing Funds were held in escrow until closing by the Arthur Friedman, as escrow agent under the Agreement.

37.    Payments for the first calendar year thereafter (2014) were to be made as follows:

```
Year 1 Payments:
Q1 (1/3 paid at the end of each month)
   Month 1              1/23/2014        25,000
   Month 2              2/23/2014        25,000
   Month 3              4/1/2014         20,000
Total Q1 2014 Payments
           Q2    7/1/2014         215,000
           Q3    10/1/2014        325,000
           Q4    12/31/2014       275,000
```

38.    Additionally, the sellers were to receive: (1) $1,975,000 paid in equal quarterly installments during 2015; (2) 1,975,000 paid in equal quarterly installments during 2016; and (3) $1,875,000 paid in equal quarterly installments during 2017.

39.    The Agreement and the accompanying payments were personally guaranteed by Michael Friedman.

**Defendants' Misuse Of The Company's Assets**

40.    While Plaintiffs did receive the money due to him at closing, the remaining

payments were quickly derailed by Defendants' looting of the Company's assets.

41. Indeed, within a week of obtaining control of the Company, Friedman and Louis began withdrawing large sums of cash from the Company's operating account. Specifically, financial records reflect cash withdrawals immediately following closing as set forth below:

| Date | Type | Amount |
|---|---|---|
| 1/03/14 | Withdrawal | $20,000 |
| 1/09/14 | Wire to "Shareholder" | $87,000 |
| 1/13/14 | Withdrawal | $1,000 |
| 1/16/14 | Withdrawal | $5,000 |
| 1/17/14 | ATM Withdrawal | $9,500 |
| 1/27/14 | Travel (PJ Louis) | $5,000 |
| 1/27/14 | ATM Withdrawals | $900 |
| 1/27/14 | "Owners travel" | $9,500 |

42. These withdrawals, which could not have been made for any legitimate purpose as the Company did not pay any of its vendors or suppliers in cash, totaled over $137,900 in January 2014 alone.

43. Upon information and belief, the "Shareholder" to whom the $87,000 wire transfer was made on January 9, 2014 was Michael Friedman's father, Arthur Friedman. While Arthur Friedman was never a shareholder of the Company, he was an owner of First Ascent.

44. Upon information and belief, the $87,000 transfer to Arthur Friedman, was made to satisfy a personal obligation owed by Friedman to his father. Neither the Company, nor First Ascent, received any consideration for this payment.

45. Moreover, upon information and belief, the lump sum withdrawal of $87,000 from the Company's operating account rendered the Company, which operated on narrow margins, insolvent.

46.     Further, throughout February and March, 2014, Defendants continued to make regular ATM withdrawals in the amount of $300 from the Company's operating account, as well as cash withdrawals of $12,000 and $1,670 on February 2, 2014 and $1,100 and $1,228.66 on March 18 and March 31, respectively.

**The First Amendment To The Stock Purchase Agreement**

47.     On or about March 31, 2014, the Company, Friedman, and Plaintiffs entered into a First Amendment to Stock Purchase Agreement (the "Amendment"). Friedman represented to Plaintiff that the Amendment was necessary in order to obtain the letter of credit ("LOC") referenced in the Agreement.

48.     The Amendment required Plaintiffs to subordinate their rights under the Agreement to TCA Global Fund ("TCA"), who would provide the LOC.

49.     In order to induce Plaintiffs into signing the Amendment and subordinating his interest in the collateral of the Company to TCA, Friedman agreed to advance the payment schedule set forth in the Agreement.  Under the Amendment, remaining 2014 payments were to be made as follows:

| Q2 | 7/1/2014 | 250,000 |
| Q3 | 10/1/2014 | 325,000 |
| Q4 | 12/31/2014 | 300,000 |

50.     Additionally, payment of the balance of the purchase price was accelerated to be completed by the close of 2016, as opposed to 2017 as originally agreed.  Thus, quarterly payments totaling $2,470,000 are due to be made in 2015 and quarterly payments totaling $3,295,000 are due to be made during 2016.

51.     Further, the Amendment requires Friedman to obtain and provide to Plaintiffs with standby letters of credit drawn on one or more bank accounts maintained

by Friedman or entities that he owns or controls, in an amount equal to the balance owed to TCA.

52. However, while the Company received in excess of $300,000 from TCA under the LOC, no such standby letters of credit were ever provided to Plaintiffs.

53. Likewise, although the Agreement requires Friedman, within six (6) months of the December 24, 2013, to secure a letter of credit covering the forward twelve months of payments due to Plaintiffs, or to show proof of funds for the difference between the value of a letter of credit and the remaining payments due to Plaintiffs, no such proof of funds was ever provided to Plaintiffs.

**The Collapse Of The Company**

54. At the same time, the Company's business continued to flounder. Although he had been withdrawing cash, Friedman failed to pay the operating costs of the business, including payments due to vendors, utilities and rent for the Company's offices and, ultimately, employees' salaries.

55. Moreover, Friedman and Louis failed to take any active role in managing the Company. Despite his promises of "hands on" management, Friedman never stepped foot inside the Company's Nevada headquarters following the sale.

56. Indeed, Friedman did not even bother to attend the Consumer Electronics tech show held in Las Vegas in early 2014, a critical annual event for all players in the consumer electronics industry.

57. Moreover, Negri came to learn that Friedman had failed to fulfill his agreement to replace Negri's personal guarantees with guarantees of his own. Accordingly, the Company's creditors began to look to Negri to satisfy debts of the

Company that Friedman had failed to pay. For example, Olen served Negri with a notice of default of the Company's rent payments due under its leases with Olen. Olen has since brought an action against Negri in California state court for this outstanding debt.

58. Ultimately, Friedman defaulted and failed to pay Plaintiffs the July 1, 2014 payment due under the Amendment. Such default constitutes not only a breach of the Agreement, but also a default under the loan agreements between the Company and TCA.

59. Accordingly, TCA has served Friedman with a notice of default and taken control of the Company's remaining assets.

60. Due to Friedman's flagrant mismanagement of the Company, vendor and client relationships have been destroyed, and the Company's reputation and goodwill have been eroded beyond repair. Indeed, in just seven months Friedman destroyed the Company it took Negri seven years to build. The Company's remaining assets are insufficient to satisfy its outstanding obligations to TCA.

61. Likewise, neither Friedman nor First Ascent appear to have sufficient assets to satisfy the payment obligations under the Agreement, or Friedman's personal guarantee thereof.

62. Upon information and belief, in an effort to avoid his creditors, Friedman transferred all of his personal assets, including his stock in the publicly-traded company of which he is CEO: Fresh Harvest Products, Inc., to his father in early 2014.

63. Friedman made these transfers, without consideration, in order to evade his future creditors by, in effect, rendering himself judgment proof.

64. Indeed, at or around this time, Friedman admitted to transferring assets to his father in order to protect his assets from creditors, including from his former girlfriend, in relation to a custody dispute regarding his daughter.

65. Friedman's confidence in this scheme – in which Arthur Friedman is complicit – is apparent from his failure to appear in this action, despite the fact that service of process has been effectuated, by personal delivery to a person of suitable age and discretion, followed by mail, to 280 Madison Avenue, New York, New York, Suite 1005, the business address of both First Ascent and Fresh Harvest Products, Inc.

66. As a result of Friedman's misconduct, Plaintiffs' rights to recover their shares of the Company are essentially valueless. Plaintiffs have been left with nothing but the Company's debts and a damaged reputation. Accordingly, Plaintiffs bring this action to rectify this shameless course of conduct and to recover the significant damages caused by Defendants' underhanded actions.

### COUNT I
### Fraudulent Misrepresentation
### (Against Michael J. Friedman)

67. Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "66" above, as if fully set forth herein.

68. Beginning in 2013, Friedman undertook a calculated scheme to take control of Negri's then-profitable Company, strip it of assets and then walk away, leaving Negri to deal with the Company's debts incurred under Friedman's management.

69. In furtherance of this scheme, Friedman entered into an Agreement with Plaintiffs pursuant to which Friedman and Arthur Freidman's company, First Ascent,

would acquire all of the outstanding common stock in the Company for a sale price in excess of $7 million.

70. In fact, Friedman never intended to honor the Agreement or to satisfy the payment obligations set forth therein.

71. Moreover, Friedman further induced Plaintiffs into amending the Agreement and subordinating their rights to TCA, with the false promise of accelerated payments of the balance of the purchase price due to Plaintiffs.

72. Again, Friedman never intended to comply with the payment schedule set forth in the Amendment, but rather sought to obtain an additional infusion of capital into the Company, which he would then withdraw for his own purposes.

73. Plaintiffs reasonably relied on Friedman's misrepresentations by entering into both the Agreement and the Amendment, conveying their shares to First Ascent and subordinating their rights to the Company's assets to TCA.

74. Ultimately, however, Friedman's true intent became apparent.  Once he gained control of the Company, he began to help himself to its cash, including transferring $87,000 from the Company's operating account to Arthur Friedman, as "shareholder" of Frist Ascent, all while defaulting on obligations to the Company's vendors and other creditors, quickly rendering the Company insolvent.

75. These actions clearly evidence that Friedman never intended to actively manage the Company or to satisfy his payment obligations to Plaintiff, but rather to wring whatever funds possible from it and then walk away, leaving Plaintiff with nothing.

76. As a result of Friedman's misconduct, Plaintiffs have suffered both the devastating loss of their interest in the Company as well as irreparable harm to the

Negri name and reputation.

### COUNT II
### Violation of New York State Debtor and Creditor Law,
### N.Y. Debt. & Cred. Law § 273, *et seq*.
### (Against Michael J. Friedman, Arthur Friedman and First Ascent)

77. Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "76" above, as if fully set forth herein.

78. As a result of First Ascent's default on its payment obligations under the Agreement, Plaintiffs are creditors of First Ascent.

79. In or about January, 2014, Friedman transferred $87,000 from the Company's operating account to Arthur Friedman, shareholder of the Company's owner, First Ascent.

80. This transfer caused the Company, and, upon information and belief, First Ascent, to become insolvent.

81. Upon information and belief, this transfer was made to satisfy a personal obligation owed by Friedman to Arthur Friedman, and without any consideration to the Company or First Ascent.

82. As an officer, director or major stockholder in First Ascent, the debtor, this transfer was fraudulent under New York's debtor and creditor laws, and should be set aside.

### COUNT III
### Violation of New York State Debtor and Creditor Law,
### N.Y. Debt. & Cred. Law § 273, *et seq*.
### (Against Michael J. Friedman and Arthur Friedman)

83. Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "82" above, as if fully set forth herein.

84. As a result of Friedman's default on his personal guarantee of the payment obligations set forth in the Agreement, Plaintiffs are creditors of Friedman.

85. In or about early 2014, Friedman transferred all of his personal assets, including his interest in the publicly-traded entity Fresh Harvest Products, Inc., to Arthur Friedman.

86. Friedman made these transfers to his father, without consideration, in order to render himself "judgment proof" and to frustrate Plaintiffs' efforts to collect on the debt owed to them by Friedman.

87. Arthur Friedman, Friedman's partner in First Ascent and escrow agent under the Agreement, knew, or should have known, that Friedman transferred his assets to him in order to evade his creditors.

88. As a result of these transfers, Friedman is insolvent.

89. Accordingly, the transfers by Friedman of his personal assets to his Arthur Friedman are fraudulent under New York's debtor and creditor laws, and should be set aside.

### COUNT IV
### Unjust Enrichment
### (Against Michael J. Friedman and Paxton Louis)

90. Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "89" above, as if fully set forth herein.

91. Beginning in January 2014, almost immediately upon taking control of the Company, defendants Michael Friedman and Louis began to withdraw cash from the Company's operating account for their own personal use.

92. The sums withdrawn amounted to over $137,000 in January alone.

93. These withdrawals damaged the Company and decreased the value of its stock, which Plaintiffs are entitled to recover under the terms of the Agreement.

94. Under the circumstances, equity and good conscience require restitution.

## COUNT V
## Unjust Enrichment
## (Against Arthur Friedman)

95. Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "94" above, as if fully set forth herein.

96. Upon information and belief, on or about January 9, 2014, Friedman transferred, via wire transfer, $87,000 of the Company's funds to Arthur Friedman to satisfy a personal obligation unrelated to the operation of the Company.

97. This transfer rendered the Company insolvent and eviscerated the value of its stock, which Plaintiffs are entitled to recover under the terms of the Agreement.

98. Moreover, Friedman transferred his personal assets to Arthur Friedman, without consideration, in order to render himself "judgment proof" and Friedman's personal guarantee to Plaintiffs worthless.

99. Thus, Arthur Friedman received a benefit at the expense of Plaintiffs.

100. Under the circumstances, equity and good conscience require restitution.

## COUNT VI
## Breach of Contract
## (Against Michael J. Friedman)

101. Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "100" above, as if fully set forth herein.

102. On or about December 24, 2013, the parties entered into the Agreement, pursuant to which Friedman personally guaranteed all payment obligations due to

Plaintiffs.

103. Plaintiffs performed all of their obligations under the Agreement.

104. Friedman has failed to make payments due to Plaintiffs under the Agreement (and the Amendment) in the amount of $6,440,800.00.

105. Friedman's breach has resulted in damages to Plaintiffs.

## COUNT VII
### Breach of Contract
### (Against First Ascent, Michael J. Friedman and Arthur Friedman)

106. Plaintiffs repeat and reallege each of the allegations contained in paragraphs "1" through "105" above, as if fully set forth herein.

107. On or about December 24, 2013, the parties entered into the Agreement, pursuant to which First Ascent, by and through its authorized representative, Michael Friedman, agreed to pay Plaintiffs $7,212,817 for their shares in the Company.

108. Plaintiffs performed all of their obligations under the Agreement.

109. First Ascent made its initial payments under the Agreement, however, in or about July, 2014, First Ascent defaulted on its remaining payment obligations.

110. First Ascent's breach of its payment obligations has resulted in damages to Plaintiffs in the amount of $6,440,800.00.

111. Upon information and belief, defendants Arthur and Michael Friedman are the owners of First Ascent.

112. Upon further information and belief, defendants Arthur and Michael Friedman have misused the corporate form by, *inter alia* (a) comingling personal funds with corporate funds, including using funds of First Ascent's subsidiary, the Company, to for their personal use; (b) failing to sufficiently capitalize First Ascent; and (c) failing to

abide by corporate formalities.

113.    Accordingly, First Ascent, Arthur Friedman and Michael J. Friedman are jointly and severally liable for Plaintiffs' damages resulting from First Ascent's breach of the Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Ryan J. Negri and Philip Negri request judgment against Defendants Michael J. Friedman, Arthur Friedman, First Ascent and P.J. (Paxton) Louis and First Ascent as follows:

- A.    On Count I, awarding Plaintiffs punitive and compensatory damages in an amount to be determined at trial;

- B.    On Count II, awarding Plaintiffs damages, including reasonable attorneys' fees, in an amount to be determined at trial;

- C.    On Count III, awarding Plaintiffs damages, including reasonable attorneys', in an amount to be determined at trial;

- D.    On Count IV, awarding Plaintiffs damages in an amount to be determined at trial;

- E.    On Count V, awarding Plaintiffs damages in an amount to be determined at trial;

- F.    On Count VI, awarding Plaintiffs damages in an amount to be determined at trial;

- G.    On Count VII, awarding Plaintiffs damages in an amount to be determined at trial; and

- H.    Granting such other relief as the Court deems just and proper, together

with interest, attorneys' fees, costs and disbursements incurred in connection with this action.

A JURY TRIAL IS DEMANDED.

Dated: White Plains, NY
April 8, 2015

DENLEA & CARTON LLP

By: <u>/s/ Joanna Sandolo</u>
Jeffrey I. Carton  (JC-8296)
Joanna Sandolo (JS-9187)
2 Westchester Park Drive, Suite 410
White Plains, NY 10604
(914) 331-0100
*Attorneys for Plaintiffs*