USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: __6/11/2015__

Michael J. Friedman
280 Madison Avenue, Suite 1005
New York, New York 10016
(917) 972-6037
*Appearing Pro Se*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RYAN J. NEGRI and PHILIP NEGRI | Docket No.: 14-cv-10233

        Plaintiff, | Hon. Gregory H. Woods, U.S.D.J.

   vs. |

MICHAEL J. FRIEDMAN, et al. | **ANSWER TO AMENDED COMPLAINT, CROSS-CLAIMS**

        Defendants. |

Defendant Michael J. Friedman ("Friedman), an individual with a business address as 280 Madison Avenue, Suite 1005, New York, New York 10016, by way of Answer to the amended complaint of Ryan J. Negri and Philip Negri (collectively "Negri"), states as follows:

### NATURE OF ACTION

1.     Denied.

2.     Denied.

3.     Denied.

4.     Denied.

5.     Denied.

6.     Denied.

7.     Denied.

RECEIVED
SDNY PRO SE OFFICE
2015 JUN 11  P 12: 42

**PARTIES**

8.    Admitted to the extent this paragraph states that Negri was the founder of the company Negri Electronics, Inc., but otherwise denied.

9.    Admitted.

10.    Denied to the extend this paragraph states that Friedman is an attorney, but otherwise admitted.

11.    Admitted.

12.    Admitted.

13.    Denied that Arthur Friedman is an owner (or member of LLC), but otherwise admitted.

**JURISDICTION AND VENUE**

14.    Admitted.

15.    Admitted.

**FACTS**

**Background**

16.    Friedman is without knowledge or information sufficient to form a belief as to the truth of these allegation.

17.    Friedman is without knowledge or information sufficient to form a belief as to the truth of these allegation.

18.    Friedman is without knowledge or information sufficient to form a belief as to the truth of these allegation.

19.    Friedman is without knowledge or information sufficient to form a belief as to the truth of these allegation.

20.   Friedman is without knowledge or information sufficient to form a belief as to the truth of these allegation.

21.   Friedman is without knowledge or information sufficient to form a belief as to the truth of these allegation.

22.   Denied.

23.   Admitted that Friedman and Negri had a telephone call on or about October 14, 2013, but otherwise denied.

24.   Admitted.

25.   Admitted.

26.   Admitted.

27.   Denied that Friedman was anxious to close the deal by the end of 2013, but otherwise admitted.

28.   Denied.

29.   Admitted.

30.   Admitted that PJ Louis had proposed a "hands on" approach and that PJ Louis would be physically present in the Nevada offices on a weekly basis, but otherwise denied.

31.   Denied.

32.   Admitted to the extent that personal guarantees were discussed, but otherwise denied.

**The Parties Enter Into The Agreement**

33.   Admitted.

34.   Admitted to the extent this paragraph accurately reflects what is contained within the Agreement.

35. Admitted to the extent this paragraph accurately reflects what is contained within the Agreement.

36. Admitted.

37. Admitted to the extent this paragraph accurately reflects what is contained within the Agreement.

38. Admitted to the extent this paragraph accurately reflects what is contained within the Agreement.

39. Admitted.

**Defendant's Misuse Of The Company's Assets**

40. Denied.

41. Admitted to the extent that these amounts were withdrawn from the operating account, but otherwise denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Admitted to the extent that these amounts were withdrawn from the operating account, but otherwise denied.

**The First Amendment To The Stock Purchase Agreement**

47. Admitted that a First Amendment to the Stock Purchase Agreement was entered into, but otherwise denied.

48. Admitted.

49.     Admitted that the parties agreed to advance the payment schedule, but otherwise denied.

50.     Admitted to the extent this paragraph accurately reflects what was contained in the first amendment to the agreement.

51.     Admitted to the extent this paragraph accurately reflects what was contained in the first amendment to the agreement.

52.     Admitted.

53.     Admitted.

**The Collapse Of The Company**

54.     Denied.

55.     Denied.

56.     Admit that Friedman did not attend the Consumer Electronics Show in order to save money for the company because PJ Louis (the CEO of the company with 30+ years telecom experience) attended the Consumer Electronics Show, but otherwise denied.

57.     Denied to the extent that Friedman, along with Louis, as the acting CEO of the company, attempted to replace Negri's personal guarantees with limited, if any, success.

58.     Admitted that a payment was not made on July 1, 2014, but otherwise denied.

59.     Denied.

60.     Denied.

61.     Admitted.

62.     Denied.

63.     Denied.

64.     Denied.

65.    Denied.

66.    Denied.

### COUNT I
### Fraudulent Misrepresentation
### (Against Michael J. Friedman)

67.    Friedman incorporates by reference its answers to the preceding paragraphs.

68.    Denied.

69.    Denied.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Friedman is without knowledge or information sufficient to form a belief as to the truth of these allegations, but to the extent a response is required; denied.

74.    Denied.

75.    Denied.

76.    Denied.

WHEREFORE, defendant Friedman demands judgment dismissing this first count of the amended complaint, together with an award of attorneys' fees and costs of suit, and such other and further relief as this Court may deem appropriate.

### COUNT II
### Violation of New York State Debtor and Creditor Law,
### N.Y. Debt. & Cred. Law Sec. 273, et seq.
### (Against Michael J. Friedman, Arthur Friedman and First Ascent)

77.    Friedman incorporates by reference its answers to the preceding paragraphs.

78.    Denied.

79.    Denied.

80.   Denied.

81.   Denied.

82.   Denied.

WHEREFORE, defendant Friedman demands judgment dismissing this second count of the amended complaint, together with an award of attorneys' fees and costs of suit, and such other and further relief as this Court may deem appropriate.

## COUNT III
### Violation of New York State Debtor and Creditor Law,
### N.Y. Debt. & Cred. Law Sec. 273, et seq.
### (Against Michael J. Friedman and Arthur Friedman)

83.   Friedman incorporates by reference its answers to the preceding paragraphs.

84.   Denied.

85.   Denied.

86.   Denied.

87.   Denied.

88.   Denied.

89.   Denied.

WHEREFORE, defendant Friedman demands judgment dismissing this third count of the amended complaint, together with an award of attorneys' fees and costs of suit, and such other and further relief as this Court may deem appropriate.

## COUNT IV
### Unjust Enrichment
### (Against Michael J. Friedman and Paxton Louis)

90.   Friedman incorporates by reference its answers to the preceding paragraphs.

91.   Denied.

92.   Denied.

93. Denied.

94. Denied.

WHEREFORE, defendant Friedman demands judgment dismissing this fourth count of the amended complaint, together with an award of attorneys' fees and costs of suit, and such other and further relief as this Court may deem appropriate.

## COUNT V
### Unjust Enrichment
### (Against Arthur Friedman)

95. Friedman incorporates by reference its answers to the preceding paragraphs.

96. Denied.

97. Denied.

98. Denied.

99. Denied.

100. Denied.

WHEREFORE, defendant Friedman demands judgment dismissing this fifth count of the amended complaint, together with an award of attorneys' fees and costs of suit, and such other and further relief as this Court may deem appropriate.

## COUNT VI
### Breach of Contract
### (Against Michael J. Friedman)

101. Friedman incorporates by reference its answers to the preceding paragraphs.

102. Admitted.

103. Denied.

104. Denied.

105. Denied.

WHEREFORE, defendant Friedman demands judgment dismissing this sixth count of the amended complaint, together with an award of attorneys' fees and costs of suit, and such other and further relief as this Court may deem appropriate.

**COUNT VII**
**Breach of Contract**
**(Against First Ascent, Michael J. Friedman, and Arthur Friedman )**

106.   Friedman incorporates by reference its answers to the preceding paragraphs.

107.   Denied.

108.   Denied.

109.   Denied.

110.   Denied.

111.   Denied.

112.   Denied.

113.   Denied.

WHEREFORE, defendant Friedman demands judgment dismissing this seventh count of the amended complaint, together with an award of attorneys' fees and costs of suit, and such other and further relief as this Court may deem appropriate.

Dated: June _10_, 2015                     By: _____

Michael J. Friedman
280 Madison Avenue, Suite 1005
New York, New York 10016
(917) 972-6037
Appearing Pro Se

## AFFIRMATIVE DEFENSES

1.   The Complaint fails to state a claim upon which relief can be granted.

2.   The Complaint is barred by the doctrine of unclean hands.

3.   The Complaint is barred by the doctrine of waiver.

4.   The Complaint is barred by the doctrine of estoppel.

5.   The Complaint is barred by the doctrine of ambiguity.

6.   The Complaint is barred by the doctrine of failure to mitigate.

7.   The Complaint is barred by the doctrine of unjust enrichment.

8.   The Complaint is barred by the doctrine of fraud, deceit and misrepresentations by Plaintiff.

9.   The Complaint is barred by the doctrine of prevention of performance.

10.   The Complaint is barred because the Plaintiff's failed to specifically allege the representations that supposedly constituted the fraud.

11.   The Complaint is barred by the doctrine of illegality.

Dated: June 10, 2015                    By:   _____

Michael J. Friedman
280 Madison Avenue, Suite 1005
New York, New York 10016
(917) 972-6037
*Appearing Pro Se*

## COUNTERCLAIM

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

2.      This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b), in that the individual Defendants reside in this District, and defendant First Ascent had its principal place of business within this District.

### FACTS COMMON TO ALL COUNTS

3.      In the Fall of 2013, Friedman, an entrepreneur, was looking for a company to acquire via seller financing and for Louis to be CEO and to operate such company.

4.      At that time, Friedman met Todd Sherman, an investment banker in New York, New York ("Sherman") who introduced Friedman to Negri and discussed Negri's company Negri Electronics, Inc. (the "Company").

5.      After the introduction and brief discussion, Friedman had a more formal teleconference with Negri, Sherman and Paxton "P.J." Louis ("Louis") to discuss the potential sale of the Company.

6.      During the teleconference, Negri provided Friedman and Louis information about the history of the Company, the current financial state of the company, and the future prospects for the Company.  Negri provided this information to Friedman and Louis as a way to entice them to pursue the purchase of the Company.

7.      After the teleconference, on or about October 16, 2013, the parties entered into a Non-Disclosure Agreement ("NDA") and Negri, through Sherman sent a "due diligence

package" to Friedman that included: business plans, tax returns, supplier information, lawsuit information, financials, bank account information for five separate accounts, an organizational chart, and other Company details.

8.      Friedman and Louis reviewed the information provided by Negri and followed up with several telephone calls to discuss the information and additional information needed to assess the opportunity.

9.      Negri sent multiple versions of the Company's financial statements and each time, the net income was increased.

10.     At the same time that Friedman was performing due diligence on the Company, Friedman and Louis were also discussing and preparing a potential business plan and corporate strategy for the Company should the sale take place.

11.     On or about December 17, 2013, Friedman and Louis traveled to Nevada to meet with Negri, inspect the warehouse, meet the employees and warehouse staff, and conduct employee interviews.

12.     After the in-person meeting, Friedman, Negri and Louis were negotiating the terms of the Agreement and a separate consulting agreement that would require Negri to continue on with the Company as a consultant for the first year after the sale transaction closed.

13.     The reason that Friedman insisted that Negri remain as a consultant was to ensure a smooth transition of the Company and to continue to take advantage of Negri's work as a salesman, which had accounted for at least two-thirds of the company sales.  Friedman knew that it would take time to get his sales force in place after the sale closed, and accordingly, Negri's obligation and promise to serve as a consultant was critical to the sale transaction.

14.     During negotiations, Friedman and Negri agreed that for the last month of operations, Negri could keep half of the cash that remained in the Company bank accounts. For example, if the Company accounts had $500,000 in cash at the time of closing, Negri would be entitled to keep $250,000.

15.     This agreement was contingent upon Negri's good faith operation of the Company during the last months leading up to the close, including the obligation for Negri to continue paying Company bills and vendor invoices as they came due.

16.     To Friedman's surprise, during the last months of operation prior to the sale, Negri boosted the amount of cash in the operating accounts by neglecting to pay numerous Company bills, including vendor and supplier bills. In fact, by February of 2014, Friedman had learned that Negri had failed to pay one vendor – Titan Enterprises – since at least November of 2013 with outstanding invoices totaling over $109,000. This tactic by Negri increased the amount that Negri was to receive as part of the sale, but left the Company in a very precarious situation with vendors and suppliers owed significant funds.

17.     Negri tried to move the negotiations forward as fast as possible and pushed Friedman for the closing to take place before December 30, 2013, in order to ensure that the closing could be attributed to the Company's 2013 fiscal year.

18.     Negri also insisted that no money be transferred until January 2014 so that Negri could complete his move from California to Nevada in order to avoid paying California income taxes on the sale transaction. This information did not seem relevant at the time, but later (in or around January/February 2014) made sense when the Company's accountant and bookkeeper informed Louis, the then CEO, that Negri had a history of routinely shredding tax documents from the State of California.

19.    On December 24, 2013, the Agreement was signed.

20.    On December 25, 2013, Friedman, Negri, and Louis were working on a press release to be sent to the staff, the vendors, and the general public to announce the sale of the Company.  The press release was sent on December 31, 2013 by Negri.

21.    In January 2014, Freidman and Louis proceeded to hire salesmen, contact vendors and establish relationships.   Internally, Friedman and Louis, set up corporate policies and procedures, changed insurance, and performed other organizational tasks to try and ensure that the transfer of ownership was as smooth as possible.

22.    It was at this time in January, that Friedman and Louis learned for the first time that the Company was completely disorganized.  There were no internal controls or procedures for the employees and there were no policies or guidelines in place for the purchase and sale of products despite the fact that Negri had represented in his business plan that all off this was in place.

23.    When queried on the policies and procedures, the typical response from Company employees was "ask Ryan [Negri]." This reaffirmed for Friedman the importance of Negri remaining in place as a consultant and the separate consulting agreement was even more critical.

24.    When queried on why there was a plethora of missing documentation and information, such as why there were 5 bank accounts, and why many personal expenses and other personal bills were paid, the typical answer from employees was, "Ryan would not tell us and handled that".

25.    . When the Company's own CPA was told by Louis that the Company wanted to perform an internal audit to try and understand how the books and records were kept and

understand the details of the Company, the CPA then stopped speaking with Louis and would not provide Louis with any assistance or information.

26.     In January 2014, Friedman also learned for the first time that the Company itself was way more starved for cash than Negri had lead on during the negotiation of the deal and it became clear that the financials provided by Negri were inaccurate.

27.     The revenue in January was also way lower than anticipated and this coupled with the fact that Negri had failed to pay vendors and suppliers for over two months prior to the sale stifled the Company's supply pipeline and allowance for credit with its vendors. The Company began to look like a ponzi scheme, in which Negri was generating new sales (and losing money on such sales) in order to pay for older bills and for his personal lifestyle (which included driving a brand new Tesla) and purchasing a $1.5 Million dollar home.

28.     Purchasing on credit is critical in this industry as often times the Company would purchase a large number of phones on credit and ultimately pay back the vendor through the sale of the phones. Because of Negri's failure to pay vendors and suppliers, by the beginning of February, the Company's vendors started refusing to extend credit to the Company, which meant that in order to secure inventory, the Company would have to pay in cash and upfront, which was not possible given the Company's – Negri-caused – cash strapped position.

29.     Friedman still believed in his management and that although sales were dropping, with the line of credit that was being negotiated, this would provide key financial support to give the Company some credit from its vendors. Because of Negri's refusal for over one month to not sign and allow the Company to receive this necessary line of credit, and because of Negri's failure to pay vendors and suppliers and their refusal to extend credit because of Negri, the Company's sales and ability to deliver on its online sales stopped. This put the Company in a

downward spiral; which could have been avoided had Negri not intentionally held up the Company's receipt of the line of credit.

30.     It was also clear that the key to essentially all of the Company's revenue was Negri himself and that despite claiming that he had a sales force in place, he was the only one making any sales. Negri essentially would be on the phone every day selling phones as opposed to running the actual Company

31.     The final nail in the Company's coffin was Negri refusing to remain in place as a consultant despite the fact that he agreed to do so for one year following the closing.  By the beginning of February, Negri informed Friedman that he would no longer work as a consultant for the Company. This left Friedman and the Company in dire straits as Negri had accounted for over two-thirds of Company revenue and his refusal to remain with the company resulted in a dramatic and ultimately fatal decrease in revenue over time.

32.     In a last ditch attempt to save the company, Friedman, Louis and Rick Landry (the then head of sales hired by Friedman in January 2014) proceeded to search of other sources of revenue – including the potential acquisition of other electronics companies – and other means of financing in order to keep the Company afloat.

33.     Friedman secured a $400,000 line of credit so that the Company could purchase inventory and remain operational; however due to Negri's refusal to sign the documentation for over 4 weeks, the Company's ability to purchase inventory and generate revenue (when coupled with Negri's refusal to remain as a consultant and generate sales) crippled the Company. Friedman also secured an additional $150,000 to infuse into the company in February and March of 2014 and an additional $50,000 in April and May – all to no avail.

34.     Friedman's sales team (despite not being able to purchase inventory) had been negotiating with several large company's and was providing quotes to the tune of several million dollars to a Fortune 100 Company.  In addition, Louis was speaking with his industry contacts and the Company was discussing performing selling to, as well as warehousing inventory for one of the top three telecommunications companies in the USA.

35.     As part of Friedman's last ditch efforts to save the Company, in May 2013 Friedman hired a highly experienced Consulting Chief Financial Officer, who had over 25 years experience in finance, restructuring, financing and complex transactions.

36.     In July and August 2014, Friedman and his executive team (including seasoned CEO, CFO, VP of sales and the Company's law firm) negotiated with investment bank(s) and a private equity fund, and even attempted to structure a deal to put the Company into a public vehicle in order to raise capital, give creditors (including Negri) an option to liquidate some of their holdings and debt, and in order to help secure funding, and to provide the Company with another avenue to negotiate with potential funding sources.

37.     Friedman also had the company which had previously provided with a $400,000 line of credit interested in further extending an additional $250,000 to the Company in order to save it, but Negri's initial refusal to negotiate, and then attempt to have Friedman agree to the funding provided that Friedman violate the terms of the line of credit in order to pay Negri, further solidified Negri's attempts to put the Company out of business and put his personal interests ahead of his duties as a Board of Director Member.

38.     In additional to this, Friedman also tried to start new lines of business, such as offering cloud services to customers, but this was not successful, due to the distractions caused by Negri's multiple and continual attempts to put the Company out of business.

39.     Since the Agreement was executed, Louis and Landry talked to various Fortune 500 companies to have them become corporate vendors – i.e. to sell phones and other products.

40.     Despite all of the attempts to save the Company, by June of 2014, the Company had no more inventory, no more credit, and for all intents and purposes the Company could no longer operate.

41.     Still, Friedman continued to negotiate with potential acquisitions, acquirers and funders in order to save the Company.  Negri would not negotiate and would not move on his position to be paid what he believed he was owed, putting his personal interests ahead of the Company and of saving the Company and its employees.  Negri had no interest in helping save the Company.  Negri would not hear any of the funding ideas, and would not even discuss any potential mergers with a public company, which would have potentially provided the Company with new avenues to find funding and save the Company, as well as giving Negri an opportunity to sell his shares in the market and liquidate his position in the Company.

42.     Friedman had frequent conference calls with his seasoned executive team in order focus on putting together recovery plans, identify areas of improvement, and to preserve and grow the corporation.

43.     On or about July 2014, Friedman and the Company's executive team met with an investment bank to help the Company raise and/or find capital.

44.     On or about July/August 2014, the Company's met with a private equity firm to purchase control of or to be a secured creditor for the Company.  Such negotiations stalled, as the Company's financial position required it to shut down and Negri's refusal to cooperate or negotiate to buy the private equity firm time to fully grasp the transaction and Friedman's ultimate growth plan.

45.     Given the disorganized state of the Company, the lack of sales force, and the lack of cash flow, at the time Negri and Friedman were negotiating the sale, the Company was clearly a sinking ship and a ponzi scheme in disguise.

46.     Negri was apparently trying to get out of the Company before it was too late and accordingly, Negri misrepresented important details of the Company during the negotiations with Friedman, including the sales, net income, and most importantly the cash flow, in order to entice Friedman to enter the purchase contract.  Negri also left the company cash strapped by failing to pay vendors leading up to the closing date, which destroyed the Company's ability to purchase on credit.

47.     Had Friedman known the true state of the Company and Negri's actual intentions to squeeze every last dime out of the Company prior to the sale, Friedman never would have entered into the purchase agreement.

### COUNT I
### Breach of the Covenant of Good Faith and Fair Dealing – Consulting Agreement
### (Against Plaintiffs)

48.     Friedman incorporates by reference the allegations in the preceding paragraphs.

49.     Implied in every contract is a covenant by the parties to act in good faith in the performance of the contract.

50.     In connection with the sale of the Company and after the Agreement was signed by the parties, Negri entered into a Consulting Agreement with the Company that required him to remain with the Company in a consulting/sales capacity for one full year following the closing date.

51.     Negri was well aware at the time he entered the Consulting Agreement that he was the key to the vast majority of the revenue of the Company and that his continued

involvement was critical to the Company's survival until such time as Friedman's new sales force could be put in place.

52.    In early February 2014 – approximately one month after the sale closed – Negri refused to continue working for the Company as a consultant.

53.    Negri's refusal to continue working as a consultant, knowing that it would cripple the company, was a breach of the covenant of good faith and fair dealing implied into every contract.

54.    As a result of Negri's breach, Friedman suffered significant damages and ultimately was a major contributing factor to the demise of the Company and the loss of Friedman's investments in the Company.

WHEREFORE, defendant Friedman demands judgment on the first count of this counterclaim against plaintiffs for rescission of the contract, compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

**COUNT II**
**Fraud**
**(Against Plaintiffs)**

55.    Friedman incorporates by reference the allegations in the preceding paragraphs.

56.    During the negotiation of the Agreement, Negri made multiple misrepresentations of material facts related to the following: the Company's earning, which were fraudulently inflated; the existing salaries, which were far more than expected; the organization of the company – it was completely disorganized; and he had also made changes to his tax returns to decrease any tax liabilities in order to avoid paying taxes.

57.    In addition to these misrepresentations, Negri also failed to disclose that he had ceased paying vendors and suppliers as of at least November 2013, which caused a significant

problem with the Company's vendors who refused to extend credit.  Further Negri failed to disclose that he was engaging in what appeared to be an internal "Ponzi scheme" by using the funds from the sale of current products at a loss to get an infusion of cash to pay old bills while disregarding what would be owed in the future.  Essentially Negri was inflating the (current) revenue and operating the company in such a way that he would never be able to catch up on his actual expenses.

58.     As a result of the numerous misrepresentations and omissions by Negri, Friedman was induced to enter into the purchase Agreement.

59.     Negri knew at the time that he was making the various misrepresentations and omissions not only that the information being misrepresented or withheld was false, but also that it was critical to Friedman's decision to purchase the Company.  Negri's misrepresentation and omissions were made with the specific intent to induce Friedman to enter the purchase Agreement.

60.     Friedman justifiably relied on the information provided by Negri and ultimate purchased the Company investing hundreds of thousands of dollars.

61.     Negri's misrepresentations related to the company resulted in significant damage to Friedman in an amount to be determined at trial but believed to be in excess of the hundreds of thousands of dollars invested into the Company both for its purchase and in the unsuccessful attempts to keep the Company afloat.

WHEREFORE, defendant Friedman demands judgment on the second count of this counterclaim against plaintiffs for rescission of the contract, compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

## COUNT III
### Civil Conspiracy
### (Against Plaintiffs)

62.     Friedman incorporates by reference the allegations in the preceding paragraphs.

63.     During the negotiations, both Negri brothers participated in the negotiations, conversations and made similar, if not the same, misrepresentations of material facts.

64.     The overt act of Ryan Negri hiring his brother Philip Negri to be the Company's Chief Financial Officer and to "clean up the books" in order for the Negri brothers to sell the Company, was an overt act by both parties in furtherance of their intentional place to sell the Company to an unsuspecting buyer.

65.     After the closing of the Agreement, Philip Negri, attempted to distance himself and would not answer direct questions asked by Louis to Negri during his further inspections of the books and records.  Philip Negri had multiple times stated to Louis something similar to, "...I will not comment on that against my brother [Ryan]...", or, "...that was before I got here, so I do not know what my brother [Ryan] was doing or did at that time...", or, "...I asked that same question when I first got here, but Ryan did not answer that question, so I made the following assumptions..."

66.     The Negri brothers acted together in furtherance of their attempt to fool a purchaser of their Company [Friedman] into paying them a substantial amount of money (both upfront and over several years), hoping that the ultimate purchaser will not realize the extent of their shenanigans and their ponzi scheme.

67.     The Negri brother's intentional acts related to the company resulted in significant damage to Friedman in an amount to be determined at trial but believed to be in excess of the

hundreds of thousands of dollars invested into the Company both for its purchase and in the unsuccessful attempts to keep the Company afloat.

WHEREFORE, defendant Friedman demands judgment on the third count of this counterclaim against plaintiffs for rescission of the contract, compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

## COUNT IV
### Fraudulent Inducement
### (Against Plaintiffs)

68.     Friedman incorporates by reference the allegations in the preceding paragraphs.

69.     During the negotiation, Negri made multiple misrepresentations and material omissions, which induced Friedman to enter into the Agreement with Negri.   Such misrepresentations and omissions include but are not limited to the true state of the company, providing false and misleading financial statements, the organization of the company, the state of the money owed to vendors and suppliers, Ryan Negri's intentions to stay on as a consultant and Negri's continued involvement in the Company.

70.     As Chief Executive Officer (Ryan Negri) and as Chief Financial Officer (Phil Negri) the Negri's knew the misrepresentations to be false and intended to induce Friedman to rely on the misrepresentations and omissions.

71.     As a result of the numerous misrepresentations and omissions Friedman justifiably relied on the misrepresentations and omissions by Negri and was fraudulently induced to enter into the purchase Agreement.

72.     As a result of the numerous misrepresentations and omissions Friedman has been injured by the multiple misrepresentations and omissions of the Negri's.

WHEREFORE, defendant Friedman demands judgment on the fourth count of this counterclaim against plaintiffs for rescission of the contract, compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

## COUNT V
### Negligent Misrepresentation
### (Against Plaintiffs)

73.    Friedman incorporates by reference the allegations in the preceding paragraphs.

74.    As Founder and the sole Board of Director Member before the Agreement, and as the only Member of the Board of Directors post execution of the Agreement, Ryan Negri had a special relationship with unique and specialized expertise of the Company. As the brother of Ryan Negri, and the only other executive of the Company, Phil Negri also possessed such unique and specialized knowledge of the Company. The Negri's were in a special position of confidence and trust with Friedman, such that Friedman justifiably and reasonably relied on the negligent misrepresentations by the Negri's.

75.    The Negri's intentionally made multiple false representations and material omissions of facts to Friedman, such that Friedman reasonably relied on the information provided by the Negri's

76.    As a result of the Negris misrepresentations, Friedman entered into the purchase transaction and ultimately was damaged to in an amount to be proven at trial, but in excess of the hundreds of thousands of dollars invested by Friedman.

WHEREFORE, defendant Friedman demands judgment on the fifth count of this counterclaim against plaintiffs for rescission of the contract, compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

## COUNT VI
### Fraudulent Misrepresentation
### (Against Plaintiffs)

77.     Friedman incorporates by reference the allegations in the preceding paragraphs.

78.     During the negotiation of the Agreement, Negri made material misrepresentations and material omissions of material facts related to: the Company's earnings, which were fraudulently inflated; the existing salaries; the organization of the Company, tax liabilities, and supplier and vendor accounts payables (including cessation of payments to vendors and suppliers).

79.     Negri's knew that such misrepresentations and material omissions of facts were false and Negri made such statements for the purpose of inducing Friedman to rely upon them.

80.     Friedman justifiably relied on Negri's misrepresentations and material omissions, and as a result Friedman entered into the purchase transaction and was suffered damage in an amount to be proven at trial, but believed to be in excess of the hundreds of thousands of dollars invested by Friedman.

WHEREFORE, defendant Friedman demands judgment on the sixth count of this counterclaim against plaintiffs for rescission of the contract, compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

## COUNT VII
### Breach of Fiduciary Duty
### (Against Ryan Negri)

81.     Friedman incorporates by reference the allegations in the preceding paragraphs.

82.     After the execution of the Agreement, Negri was a Board of Director Member and breached his fiduciary duties multiple times by continuously putting his personal interests ahead

of the Company's needs and interests. Negri abused his influence. Negri's breaches include self dealing and personal interest conflicts with the Company.

83.   Negri breaching his fiduciary duties and acting against the best interests of the Company injured Friedman and the Company.

84.   Negri's actions and misconduct directly caused damages to the Company and to Friedman.

85.   Even before the execution of the Agreement Negri breach his fiduciary duty to the Company by allowing the Company to be so cash starved that he knew there was no way for the Company to be turned around and saved.

86.   Negri's intimate knowledge of the Company's financial position Negri knew that the Company needed financing, lines of credit and the ability to purchase inventory on credit, however by denying to approve the Company's line of credit and intentionally waiting over one month to sign off on the line of credit documentation, Negri knew that the sales would go to zero and that the Company would be starved for cash.

WHEREFORE, defendant Friedman demands judgment on the seventh count of this counterclaim against plaintiffs for compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

### COUNT VIII
### Breach of Duty of Care, Duty of Good Faith and Fair Dealing, Duty of Loyalty, and Breach of Implied Covenant
### (Against Ryan Negri)

87.   Friedman incorporates by reference the allegations in the preceding paragraphs.

88.   Negri, as a Board of Director Member of the Company (both before and after the execution of the Agreement) failed to act in good faith and breached his fiduciary duties of Care, Good Faith and Loyalty by his inaction in informing the Board and executives of the true state of

the Company, by his inaction and intentional delay in the execution of the line of credit agreement(s) on or about February/March and on or about May/June, by not exploring or discussing alternative methods to finance and to save the Company from failing and going out of business, and by his intentionally putting his self interests ahead of the needs of the Company. Negri failed to act as an ordinary prudent Director should act, and injured the Company.

89.     Negri was informed of the relevant and material information reasonably available, by the Company's management team, which included multiple experts in the industry, yet Negri intentionally failed to act and perform his fiduciary duties.

90.     As a result of Negri's breaches, Friedman and the company suffered damages.

WHEREFORE, defendant Friedman demands judgment on the eighth count of this counterclaim against plaintiffs for compensatory damages and consequential damages, together with interest, attorney's fees and costs of suit.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendant Michael J. Friedman prays the Court and requests judgment against Petitioners Ryan J. Negri and Philip Negri ("Negri"), jointly and severally, for an amount in excess of $_____ for compensatory and punitive damages, together with the costs of this suit, interest from the date this suit was instituted, reasonable attorney's fees, and such other relief as the Court may deem just and proper, including but not limited to, as follows:

A. On Count I, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

B. On Count II, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

C. On Count III, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

D. On Count IV, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

E. On Count V, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

F. On Count VI, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

G. On Count VII, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

H. On Count VIII, awarding Defendant punitive and compensatory damages in an amount to be determined at trial;

I.   Granting such other relief as the Court deems just and proper, together with interest, attorneys' fees, costs and disbursements incurred in connection with this action.

A JURY TRIAL IS DEMANDED.

Dated:        New York, NY
              June 10, 2015

By: _____
Michael L. Friedman
280 Madison Avenue, Suite 1005
New York, New York 10016
(917) 972-6037
*Appearing Pro Se*

Align top of FedEx Express® shipping label here.

Envelope

earthsmart

FedEx carbon-neutral
envelope shipping

Print #180287

SHIP DATE: 10JAN15
ACTWGT: 0.3 LB
CAD: 6891472PSF01001

BILL CREDIT CARD

ORIGIN ID:RGA   (917) 972-6037
MITCHELL J FRIEDMAN
280 MADISON AVE
LOS ANGELES, NY 10016
NEW YORK, NY 10016
UNITED STATES US

TO  PRO SE INTAKE UNIT
    US DISTRICT COURT OF SOUTHERN DIST
    500 PEARL ST
    SUITE 200
    NEW YORK CITY NY 10007
    (212) 805-0175

FedEx
Express

THU – 11 JUN 10:30A
PRIORITY OVERNIGHT

10007
NY-US EWR

TRK# 7807 9909 2322

E3 PCTA

FedEx Express