Michael J. Friedman
280 Madison Ave, Suite 1005
New York, NY 10016

*Defendant Appearing Pro Se*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RYAN J. NEGRI and PHILIP NEGRI

        Plaintiff,

    vs.

MICHAEL  J.  FRIEDMAN,  ARTHUR
FRIEDMAN and P.J. LOUIS

       Defendants.

Docket No.: 14-cv-10233

Hon. Gregory H. Woods, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/20/16

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## BY DEFENDANT MICHAEL J. FRIEDMAN

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 2

STATEMENT OF FACTS ........................................................................................... 3

ARGUMENT ............................................................................................................... 13

Standard of review on these Motions ..................................................................... 13

I.      Negri has not identified any misrepresentations by Friedman, the individual, and
        has failed to produce any evidence that Friedman intentionally failed to disclose any
        information therefore, Negri cannot establish the necessary elements for Count I of
        the complaint for Fraudulent Misrepresentation ......................................... 14

II.     Counts Two and Three of the Complaint for violations of New York's debtor-
        creditor law, must also fail as New York law does not apply to this transaction and
        even if it did, Negri cannot establish that Friedman, the individual, made a
        fraudulent conveyance in connection with the sale of Negri Electronics .......... 17

III.    Negri has not established that Friedman received any improper transfers of funds
        from the Company nor can Negri establish any decrease in the value of Negri
        Electronic's stock and accordingly, Negri cannot support his claim for unjust
        enrichment ............................................................................................... 19

IV.     Friedman never entered into a separate personal guaranty agreement, as required
        by Nevada law and the Statute of Frauds, and accordingly there was no enforceable
        guaranty between Friedman and Negri ....................................................... 20

V.      Piercing the corporate veil in Nevada requires the presence of "fraud" or "manifest
        injustice." This is the highest standard for personal indemnification available and
        Negri has failed to establish any basis to pierce the corporate veil and proceed
        against Friedman personally ..................................................................... 22

VI.     By entering into a Subordination Agreement with TCA Negri subordinated all of his
        claims and rights to pursue Friedman in a lawsuit and accordingly this action must
        be dismissed ........................................................................................... 25

CONCLUSION .......................................................................................................... 27

## **TABLE OF AUTHORITIES**

**Case Law:**

Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337 (9th Cir. 1995) ...................... 14

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). .................................................. 14

Baer v. Amos J. Walker, Inc., 452 P.2d 916 (Nev. 1969) ............................................ 23

Bennett v. Spear, 520 U.S. 154 (1997) ...................................................................... 25

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..................................................... 13, 14

Commercial Trading Co. v Potter Securities Corp., 26 A.D.2d 761 (1966) ................................ 17

Havas v. Alger, 461 P.2d 857 (1969) ............................................................... 15, 16

Huit Corp. v Siskind, 30 Misc 2d 598 (1961) ............................................................ 17

In re AMERCO Derivative Litig., 252 P.3d 681 (2011) ................................................... 25

J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc., 89 P.3d 1009 (2004) ............................ 15

Kennedy v. Carriage Cemetery Services, Inc., 727 F.Supp.2d 925 (D.Nev. 2010) .................... 19

Leasepartners Corp., Inc. v. Robert L. Brooks Trust, P.2d 182 (Nev.1997) .............................. 19

LFC Mktg. Grp., Inc. v. Loomis, 8 P.3d 841 (Nev. 2000) ............................................ 23

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990) ..................................................... 14

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) .................................. 13

N. Arlington Med. Bldg., Inc. v. Sanchez Constr. Co., 471 P.2d 240 (Nev. 1970) ...................... 23

Nevada Tax Comm'sn v. Hicks, 310 P.2d 852 (1957) .................................................... 15

Pentax Corp. v. Boyd, 904 P.2d 1024 (Nev. 1995) ....................................................... 21

Schmitt v Morgan, 98 A.D.2d 934 (A.D.3d 1983) ....................................................... 17

Simpson v. Harris, 31 P. 1009 (Nev. 1893) ............................................................... 21

Villiarimo v. Aloha Island Air Inc., 281 F.3d 1054 (9th Cir. 2002) ..................................... 14

Wagman v Lagno, 141 A.D.2d 720 (1988) ......................................................... 17

Webb v. Shull, 270 P.3d 1266 n.3 (Nev. 2012) ................................................ 23

**Other Authorities:**

Fed. R. Civ. P. 56(e) ...................................................................................... 13

Nevada Revised Statute 78.747 ...................................................................... 22, 24

Nevada Revised Statute 111.220 ..................................................................... 20

## PRELIMINARY STATEMENT

Even though the purchase of Negri Electronics went horribly wrong for all parties, it does not support the scorched earth litigation tactics that plaintiff Ryan Negri ("Negri") has applied in this action.  Negri sued every available party (whether they were potentially liable or not) and after the dust cleared and the numerous parties were dismissed, the only claims remaining are those against an individual, Michael J. Friedman ("Friedman"), who did everything he could to save the transaction and the company he purchased in late 2013.  Despite Friedman's efforts, the company failed due to the mismanagement and lack of cooperation from Negri.  Now Negri has dismissed all parties, except Friedman (perhaps due to a grudge), despite the fact that during the almost two years of discovery in this action, Negri has been completely unable to support critical elements of each of his claims.

Negri has not identified any misrepresentations by Friedman, the individual, and has failed to produce any evidence that Friedman intentionally failed to disclose any information therefore, Negri cannot establish the necessary elements for Count I of the complaint for Fraudulent Misrepresentation. Counts Two and Three of the Complaint for violations of New York's debtor-creditor law, must also fail as New York law does not apply to this transaction and even if it did, Negri cannot establish that Friedman, the individual, made a fraudulent conveyance in connection with the sale of Negri Electronics.  Negri has not established that Friedman received any improper transfers of funds from the Company nor can Negri establish any decrease in the value of Negri Electronic's stock and accordingly, Negri cannot support his claim for unjust enrichment. Further, Friedman never entered into a separate personal guaranty agreement, as required by Nevada law and the Statute of Frauds, and accordingly there was no enforceable guaranty between Friedman and Negri.

In addition to Negri's failure to establish the elements of his various claims, there are two procedural reasons why summary judgment is appropriate. First, piercing the corporate veil in Nevada requires the presence of "fraud" or "manifest injustice." This is the highest standard for personal indemnification available and Negri has failed to establish any basis to pierce the corporate veil and proceed against Friedman personally. And finally, by Negri's entering into a Subordination Agreement with TCA he subordinated all of his claims and rights to pursue Friedman in a lawsuit and accordingly lacks standing to pursue his claims.   Accordingly, summary judgment is appropriate dismissing all of Negri's claims with prejudice.

## STATEMENT OF FACTS

The facts in support of this motion are provided in the separate statement of undisputed facts served in connection with this motion; however, the facts are summarized here for the Court's convenience.

First Ascent, LLC was formed in early March 5, 2013 by Friedman.  First Ascent is a Delaware, LLC and Friedman formed First Ascent to use as a vehicle to purchase several companies in the telecom space.  The goal was to buy several companies in the telecom space and use First Ascent as a central vehicle for the growth of the companies acquired.  Since March of 2013, First Ascent was actively working on purchasing a data center, First Ascent started a "cloud services" division, and was involved in a software development partnership. First Ascent was also actively looking to purchase several telecom companies to manage and grow. (Friedman Dec., para. 75). First Ascent was also working with network providers to purchase or start its own MVNO (Mobile Virtual Network Operator), which is a wireless communication network provider that does not own the wireless network (an example would be Boost Mobile using Sprint's wireless network). Friedman was the managing member of First Ascent and the

intention was to bring on P.J. Louis to come on board as an owner/member as well once things were up and running in the telecom space.

In the Fall of 2013, First Ascent, LLC, was looking for a company to acquire via seller financing and for Paxton "P.J." Louis ("Louis") to be CEO and to operate such company. At that time, Friedman met Todd Sherman ("Sherman"), an investment banker in New York, New York who introduced him to Negri and discussed Negri's company Negri Electronics, Inc. (the "Company"). After the introduction and brief discussion, Friedman, on behalf of First Ascent, had a more formal teleconference with Negri, Sherman and Louis to discuss the potential sale of the Company. During the teleconference, Negri provided Friedman and Louis, on behalf of First Ascent, information about the history of the Company, the current financial state of the company, and the future prospects for the Company.  Negri provided this information to First Ascent as a way to entice it to pursue the purchase of the Company.

After the teleconference, on or about October 16, 2013, Negri and First Ascent entered into a Non-Disclosure Agreement ("NDA") and Negri, through Sherman sent a "due diligence package" to First Ascent that included: business plans, tax returns, supplier information, lawsuit information, financials, bank account information for five separate accounts, an organizational chart, and other Company details. First Ascent reviewed the information provided by Negri and followed up with several telephone calls to discuss the information and additional information needed to assess the opportunity.

Over the course of the next few weeks, Negri sent multiple versions of the Company's financial statements and each time the net income was increased. At the same time that First Ascent was performing due diligence on the Company, First Ascent was also discussing and

preparing a potential business plan and corporate strategy for the Company should the sale actually take place.

On December 17, 2013, Louis and Friedman, on behalf of First Ascent, traveled to Nevada to meet with Negri, inspect the warehouse, meet the employees and warehouse staff, and conduct employee interviews. After the in-person meeting in Nevada, Negri and First Ascent continued negotiating the terms of the agreement to purchase the Company and a **separate** consulting agreement that would require Negri to continue on as a consultant for the first year after the purchase closed. The reason that First Ascent insisted Negri remain as a consultant was to ensure a smooth transition of the company and to continue to take advantage of Negri's work as a salesman, which had accounted for at least two-thirds of the company sales. First Ascent knew that it would take time to get his sales force in place after the sale closed and accordingly, Negri's obligation and promise to serve as a consultant was critical to the sale transaction.

In addition to the separate consulting agreement with Negri, the concept of Friedman guaranteeing the purchase of the Company was also discussed, and a provision was actually put into the agreement referencing the guaranty. Despite the discussions regarding the guaranty however, Friedman never actually entered into a separate guaranty agreement and the purchase transaction of the Company went forward without a separate guaranty agreement. It was Friedman's understanding that the parties were abandoning any guaranty obligations from Friedman as the matter was not pursued.

During the negotiation process, First Ascent also agreed that for the last month of operations, Negri could keep half of the cash that remained in the Company bank accounts. For example, if the Company accounts had $500,000 in cash at the time of closing, Negri would be entitled to keep $250,000. This agreement was contingent upon Negri's good faith operation of

the Company during the last months leading up to the close, including the obligation for Negri to continue paying Company bills and vendor invoices as they came due. To First Ascent's surprise, during the last months of operation prior to the sale, Negri boosted the amount of cash in the operating accounts **by neglecting to pay numerous Company bills**, including vendor and supplier bills.  In fact, by February of 2014, Friedman learned that Negri had failed to pay several vendors – including Titan Enterprises and Secure enterprises – since at least October of 2013, with outstanding invoices totaling over $109,000 – which was prior to the time that Negri began negotiations with First Ascent. This tactic by Negri increased the amount that Negri was to receive as part of the sale, but left the Company in a very precarious situation with vendors and suppliers owed significant funds.

Negri tried to move the negotiations forward as fast as possible and pushed for the closing to take place before December 30, 2013, in order to ensure that the closing could be attributed to the Company's 2013 fiscal year.  Negri also insisted that no money be transferred until January 2014 so that Negri could complete his move from California to Nevada in order to avoid paying California income taxes on the sale transaction. This information did not seem relevant at the time, but later (in or around January/February 2014) made sense when the Company's accountant and bookkeeper informed Louis, the then CEO of First Ascent, that Negri had a history of routinely shredding tax documents from the State of California.

On December 24, 2013, in accordance with Negri's rapid timeframe, the Purchase Agreement was signed.  The Purchase Agreement included a "merger clause" at Section 9(b) which provided that: "This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous

agreements, representations and understanding of the parties. No supplement modification or amendment of this Agreement shall be binding unless executed in writing by all the parties."

Also, the Purchase Agreement specifically stated that the governing law of the agreement is the laws of the State of Nevada and in the "Notice" section, Michael Friedman the individual (or as guarantor as argued by Negri) is **not** included as an entity to receive notice.  The only entities that are required to receive notice are First Ascent, LLC, Shareholders, Ryan Negri and Philip Negri and the escrow agent.

The Purchase Agreement also included an attorney's fees provision which stated that: "in the event any action is brought to enforce this Agreement, the prevailing party shall be entitled to recover its costs of enforcement including, without limitation, attorney's fees and court costs" and in the section entitled "construction" of the agreement it stated that: "this agreement and any documents or instruments delivered pursuant hereto shall be construed without regard to the identity of the person who drafted the various provisions of the same.  Each and every provision of this Agreement and such other documents and instruments reflects a negotiated outcome and as such shall be construed as though the parties participated equally in the drafting of the same. Any rule of construction providing that a document or provisions be construed against the drafting party shall not be applicable to this agreement or such other documents and instruments."

Finally, the signature page of the Purchase Agreement only required First Ascent, Ryan Negri and Philip Negri (on behalf of Negri Electronics) and Ryan Negri and Philip Negri (on behalf of the selling shareholders) to sign the agreement.  Michael Friedman as a supposed guarantor was not obligated to sign the Purchase Agreement and as noted above, no guaranty agreement was ever entered into between the parties.

In January 2014, Louis and Friedman (now acting on behalf of Negri Electronics) proceeded to hire salesmen, contact vendors, and establish relationships. Internally, Friedman and Louis, set up corporate policies and procedures, changed insurance, and performed other organizational tasks to try and ensure that the transfer of ownership was as smooth as possible. It was at this time in January, that Friedman learned for the first time that the Company was completely disorganized. There were no internal controls or procedures for the employees and there were no policies or guidelines in place for the purchase and sale of products despite the fact that Negri had represented in his business plan that all off this was in place.

When queried on the policies and procedures, the typical response from Company employees was "ask Ryan [Negri]." This reaffirmed for Friedman the importance of Negri remaining in place as a consultant and the separate consulting agreement was even more critical. When employees were queried on why there was a plethora of missing documentation and information, such as why there were 5 bank accounts, and why many personal expenses and other personal bills were paid, the typical answer from employees was, "Ryan would not tell us and handled that".

In January 2014, Friedman also learned for the first time that the Company itself was way more starved for cash than Negri had lead on during the negotiation of the deal and it became clear that the financials provided by Negri were inaccurate. The revenue in January was also way lower than anticipated and this coupled with the fact that Negri had failed to pay vendors and suppliers for over two months prior to the sale, stifled the Company's supply pipeline and allowance for credit with its vendors. The Company began to look like a Ponzi scheme, in which Negri was generating new sales (and losing money on such sales) in order to pay for older bills

and for his personal lifestyle (which included driving a brand-new Tesla) and purchasing a $1.5 Million-dollar home.

Purchasing on credit is critical in this industry as often times the Company would purchase a large number of phones on credit and ultimately pay back the vendor through the sale of the phones.  Because of Negri's failure to pay vendors and suppliers, by the beginning of February, the Company's vendors started refusing to extend credit to the Company, which meant that in order to secure inventory, the Company would have to pay in cash and upfront, which was not possible given the Company's – Negri-caused – cash strapped position.

It was also clear that the key to essentially all of the Company's revenue was Negri himself and that despite claiming that he had a sales force in place, he was the only one making any sales. Negri essentially would be on the phone every day selling phones as opposed to running the actual Company. The final nail in the Company's coffin was Negri refusing to remain in place as a consultant despite the fact that he agreed to do so for one year following the closing.  By the beginning of February, Negri informed Freidman that he would no longer work as a consultant for the Company. This left the Company in dire straits as Negri had accounted for over two-thirds of Company revenue and his refusal to remain with the company resulted in a dramatic and ultimately fatal decrease in revenue over time.

In a last-ditch attempt to save the company, Louis, Friedman, and Rick Landry (the then head of sales hired by me in January 2014) proceeded to search for other sources of revenue – including the potential acquisition of other electronics companies – and other means of financing in order to keep the Company afloat.  Friedman was doing everything he possibly could to save the company, despite Negri's creating constant roadblock's and hurdles. In fact, Friedman was able to secure a $400,000 line of credit so that the Company could purchase inventory and

remain operational; however due to Negri's refusal to sign the documentation for over 4 weeks, the Company's ability to purchase inventory and generate revenue (when coupled with Negri's refusal to remain as a consultant and generate sales) crippled the Company. Friedman had also secured an additional $150,000 to infuse into the company in February and March of 2014 and an additional $50,000 in April and May – all to no avail.

Friedman's sales team (despite not being able to purchase inventory) had been negotiating with several large company's and was providing quotes to the tune of several million dollars to a Fortune 100 Company.  In addition, Louis was speaking with his industry contacts and the Company was discussing performing selling to, as well as warehousing inventory for one of the top three telecommunications companies in the USA. As part of Friedman's last ditch efforts to save the Company, in May 2013 Friedman hired a highly-experienced Consulting Chief Financial Officer, who had over 25 years' experience in finance, restructuring, financing and complex transactions.

In July and August 2014, Friedman's executive team (including seasoned CEO, CFO, VP of sales and the Company's law firm) negotiated with investment bank(s) and a private equity fund, and even attempted to structure a deal to put the Company into a public vehicle in order to raise capital, give creditors (including Negri) an option to liquidate some of their holdings and debt, and in order to help secure funding, and to provide the Company with another avenue to negotiate with potential funding sources. Friedman also had the Company, which had previously been provided with a $400,000 line of credit, interested in further extending an additional $250,000 to the Company in order to save it, but Negri's initial refusal to negotiate, and then attempt to have Friedman agree to the funding provided that he violate the terms of the existing

line of credit in order to pay Negri, further solidified Negri's attempts to put the Company out of business and put his personal interests ahead of his duties as a Board of Director Member.

In additional to all of these efforts, Freidman also tried to start new lines of business, such as offering cloud services to customers, but this was not successful, due to the distractions caused by Negri's multiple and continual attempts to put the Company out of business. Despite all of the attempts to save the Company, by June of 2014, the Company had no more inventory, no more credit, and was for all intents and purposes could no longer operate. Still, Friedman continued to negotiate with potential acquisitions, acquirers and funders in order to save the Company. Negri, on the other hand, would not negotiate and would not move on his position to be paid what he believed he was owed, putting his personal interests ahead of the Company and of saving the Company and its employees.

Given the disorganized state of the Company, the lack of sales force, and the lack of cash flow, at the time Negri and Friedman were negotiating the sale, the Company was clearly a sinking ship and a Ponzi scheme in disguise. Negri was apparently trying to get out of the Company before it was too late and accordingly, Negri misrepresented important details of the Company during the negotiations with Friedman (now acting on behalf of Negri Electronics), including the sales, net income, and most importantly the cash flow, in order to entice First Ascent to enter the purchase contract. Negri also left the company cash strapped by failing to pay vendors leading up to the closing date, which destroyed the Company's ability to purchase on credit. Had First Ascent known the true state of the Company and Negri's actual intentions to squeeze every last dime out of the Company prior to the sale, it never would have entered into the purchase agreement.

After Negri's deal with First Ascent failed, Negri filed a complaint in the Southern District of New York alleging claims for Fraudulent Misrepresentation, Unjust Enrichment, Breach of Contract.  The complaint was subsequently amended and re-filed on April 8, 2015 at which time Negri added claims for violation of the New York Debtor Creditor law as well as a second count for breach of contract. Various claims and parties were dismissed and the only remaining claims are: Count I for Fraudulent Misrepresentation, Count II and III for violations of the New York Debtor Creditor Law, Count IV for Unjust Enrichment, and Count VI and VII for Breach of Contract.

The parties engaged in discovery on all of Negri's claims and on September 26, 2016 Negri was deposed.  During the deposition, Negri admitted that during the negotiations for the purchase and sale of the Company, Negri retained an external attorney, Tom Lamons from Cummins & White, as well as an accounting firm. Negri also discussed the sale of the Company with Todd Sherman, who was an investment banker.  In fact, Negri was introduced to First Ascent through Todd Sherman and it was Todd Sherman that advised Negri to close the acquisition with First Ascent.

During the deposition, Negri also admitted that the **only** two agreements entered into between the parties was the Purchase Agreement and a Consulting Agreement – no other agreements were signed that day. Negri also admitted that several months after the closing, he signed a subordination agreement and an amendment to the original purchase agreement.   A lawyer assisted Negri in the negotiations of the subordination agreement.

Negri admitted during his deposition that he believed the Company's money was misused.  When asked to clarify however, Negri could only point to certain withdrawals of money from the Company's bank account.  Negri admitted however, that he did not know what

the withdrawals were used for, only that there were withdrawals. Further, when asked at deposition what statements were made to Negri that weren't true, Negri stated: "specifically the wealth of the executive of First Ascent, promising and never furnishing documents, promises to run the company locally as opposed to absentee. Other than the above statements, Negri could not point to any other misstatement or alleged misrepresentations by First Ascent or Friedman.

Several months after the purchase of transaction closed, Negri entered into a subordination agreement with TCA Global Credit Master Fund, LP.  The purpose of the subordination agreement was for Negri Electronics to secure a line of credit with TCA so that Negri Electronics could receive $400,000 and pay for inventory and to help grow the company. The maximum credit limit with TCA was $3,000,000. As part of the agreement and the receipt of credit from TCA, Negri agreed to subordinate all of his rights and claims to TCA.

## ARGUMENT

### Standard of review on these Motions

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e).

All justifiable inferences must be viewed in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the

mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials provided by Rule 56(e), showing there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The court need only resolve factual issues of controversy in favor of the nonmoving party where the facts specifically averred by that party contradict facts specifically averred by the movant. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment). "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment. Villiarimo v. Aloha Island Air Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

In this case, despite having almost two years of discovery, Negri has failed to produce any documents, testimony or any other evidence to prove the essential elements of his claims. Accordingly, this court may properly grant summary judgment dismissing all remaining claims against Friedman.

I.   **Negri has not identified any misrepresentations by Friedman, the individual, and has failed to produce any evidence that Friedman intentionally failed to disclose any information therefore, Negri cannot establish the necessary elements for Count I of the complaint for Fraudulent Misrepresentation**.

Negri, cannot prove that Friedman, the individual, made any misrepresentations during the negotiation for the purchase of Negri Electronics and accordingly, Count I for fraudulent misrepresentation must fail.  In order to prove a claim for fraudulent misrepresentation a plaintiff must prove the following elements: (1) defendant made a false representation, (2) with

knowledge or belief that the representation was false or without a sufficient basis for making the representation, (3) the defendant intended to induce the plaintiff to act or refrain from acting on the representation, (4) the plaintiff justifiably relied on the representation, and (5) the plaintiff was damaged as a result of his reliance. J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc., 120 Nev. 277, 290–91, 89 P.3d 1009, 1018 (2004).  Each element must be proven by clear and convincing evidence and fraud is never presumed, it must be clearly and satisfactorily proved. Havas v. Alger, 85 Nev. 627, 631, 461 P.2d 857, 860 (1969).

Here, the claim in Count I is against Friedman, the individual.   Therefore, any representations that serve as the basis for fraud must have been made by Friedman, the individual, as opposed to Friedman as a member of First Ascent.   (See e.g. Nevada Tax Comm'sn v. Hicks, 73 Nev. 115, 129-130, 310 P.2d 852 (1957) [The theory of corporate entity is simply that a corporation possesses a legal entity apart from the people who compose it]). Throughout the course of discovery, Negri has failed to identify any representations (let alone misrepresentations) made by Friedman, the individual, in connection with the purchase of Negri electronics.  In fact, when asked at deposition what, if any, statements were made to Negri that weren't true, Negri only stated: "specifically the wealth of the executive of First Ascent, promising and never furnishing documents, promises to run the company locally as opposed to absentee. (Negri Dep. page 49, lines 1-21). Other than the above statements, Negri could not point to any other alleged misstatement or alleged misrepresentations.

None of the three statements identified by Negri during his deposition can serve as a basis for fraud against Friedman.   First, Negri has not provided any specific information regarding why or how any of the above three statements weren't true (Negri did not even identify the supposed documents that were not furnished or what the specific details were about the

"wealth" of the executives of First Ascent).   In fact, Negri provides no detail whatsoever regarding any of the three statements that supposedly serve as his basis for fraud, and as this court is well aware, it is Negri's burden of proof to establish any fraud or misrepresentations by clear and convincing evidence. Havas, 85 Nev. at 631.

Further, even if the three general statements above could serve as a basis for fraud, Negri has not pointed to any document or other evidence showing that these three statements were relied upon by him during the negotiations of the sale of Negri Electronics.   In fact, Negri admitted during his deposition that he retained an external attorney, Tom Lamons from Cummins & White, as well as an accounting firm to help with the negotiations. (Negri Dep., page 11, line 23 through page 12, line 11; page 20, lines 3-6).  Negri also admitted that he discussed the sale of the Company with Todd Sherman, who was an investment banker (Negri Dep., page 13, line 6 through 12) and it was **Todd Sherman** (notably not Friedman) that advised Negri to close the acquisition with First Ascent.  (Negri Dep., page 54, lines 22-24).  If Negri was relying on the advice of Todd Sherman – his investment banker – to go forward with the sale of Negri Electronics, it follows that he was not relying on Friedman, the individual.  In regards to the statement about running the company locally, Negri was well aware that both Friedman and P.J. Louis lived in New York and accordingly, it was not feasible for either to run the company in Nevada, which is exactly why one of the requirements of the purchase agreement was Negri remaining with the company as a consultant, which he didn't do.

Finally, all of the "representations" noted by Negri were made by or on behalf of First Ascent, during the negotiations for the purchase of Negri electronics – not Friedman the individual.   As noted above, it is well settled that a corporation is a separate entity from its shareholders or officers and the same holds true for LLC's. Negri has not pointed to any reason

or basis to pierce the corporate veil to hold Friedman liable personally for any supposed misrepresentations by First Ascent (more on this below) and therefore, Negri's claims for fraudulent misrepresentation must fail.

**II.      Counts Two and Three of the Complaint for violations of New York's debtor-creditor law, must also fail as New York law does not apply to this transaction and even if it did, Negri cannot establish that Friedman, the individual, made a fraudulent conveyance in connection with the sale of Negri Electronics.**

Negri's claims for violation of the New York's Debtor/Creditor law should be dismissed as Nevada as opposed to New York law applies to this transaction.  Further, Negri cannot establish that Friedman made any conveyances that would subject him to personal liability. Under Debtor and Creditor Law § 273, "every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." As is evident from the statute, "both insolvency and inadequacy of consideration are pre-requisites to a finding of constructive fraud." Huit Corp. v Siskind, 30 Misc 2d 598, 599, 219 N.Y.S.2d 982 (1961); see also, Schmitt v Morgan, 98 A.D.2d 934 (A.D.3d 1983); Creditor's Rights and Remedies, § 262, at 178-179). The burden of proving both insolvency and the lack of fair consideration is upon the party challenging the conveyance.  Commercial Trading Co. v Potter Securities Corp., 26 AD2d 761 (1966); Marine Midland Bank v Murkoff, 120 AD2d 122, and the determination of insolvency or what constitutes fair consideration is generally one of fact to be determined under the circumstances of the particular case. Wagman v Lagno, 141 AD2d 720 (1988).

Here, Negri has alleged in his complaint two separate "conveyances" to support his two claims (Count II and Count III) for violation of New York's Debtor/Creditor law.  First, in Count Two, Negri asserts that First Ascent transferred $87,000 to Arthur Friedman in January of 2014.

Despite alleging that this transfer took place, Negri has provided no evidence to support this. In fact, the transfer was actually made by Negri Electronics to Arthur Friedman – not by First Ascent and certainly not by Friedman. Further, Negri has provided no evidence, other than unsupported allegations, that the transfer of $87,000 rendered the company insolvent (or that the company was insolvent at the time of the transfer). In fact, the undisputed facts of the case prove otherwise, as Negri Electronics was in business for months after January 2014 and had received some $400,000 in credit in April 2014 and additional influxes of cash thereafter. Finally, Negri has provided no evidence to suggest that Negri Electronics transfer of $87,000 to Arthur Friedman was done without fair consideration. As a matter of fact, although there were claims against Arthur Friedman in this case, including claims under the New York Debtor/Creditor law, all of those claims have already been dismissed. Negri cannot support his claims for violation of the New York Debtor/Creditor law and accordingly Count II should be dismissed.

In regards to Count III, Negri has alleged (and without any support) that: Friedman defaulted on his personal guaranty to Negri and that after defaulting, Friedman transferred all of his assets to Arthur Friedman (See Amended Complaint). Again, aside from blanket allegations, Negri has not provided any proof of these claims against Friedman. First, as will be discussed below, Friedman never entered into a separate personal guaranty of the purchase transaction and accordingly could not have breached any guaranty agreement. Second, even if there was a breach, Negri has provided no evidence to show that Friedman transferred any assets to Arthur Friedman. When specifically asked about this during deposition, Friedman denied making any transfers and Negri has not produced one single document suggesting that Friedman made any inappropriate transfers of assets. Accordingly, Negri cannot support his claims under Count III for violation of New York's Debtor Creditor law and summary judgment is appropriate.

**III.   Negri has not established that Friedman received any improper transfers of funds from the Company nor can Negri establish any decrease in the value of Negri Electronic's stock and accordingly, Negri cannot support his claim for unjust enrichment**

Negri cannot support his claim for unjust enrichment as Friedman did not receive any improper transfers of funds.  Under Nevada law, the elements of an unjust enrichment claim or, "quasi contract" claim, are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; (3) acceptance and retention of the benefit by the defendant; (4) in circumstances where it would be inequitable to retain the benefit without payment. Kennedy v. Carriage Cemetery Services, Inc., 727 F.Supp.2d 925, 932 (D.Nev. 2010) (citing Leasepartners Corp., Inc. v. Robert L. Brooks Trust, 113 Nev. 747, 942 P.2d 182, 187 (Nev.1997)).  Again, as this claim is against Friedman individually, Negri has the burden of establishing all of the elements of this claim against Friedman himself and as with Negri's other claims in this case, Negri has utterly failed to do so.

In the complaint, Negri asserts that Friedman transferred $137,000 from the operating account of Negri Electronics – again not Negri, the plaintiff.  Assuming for purposes of this motion that Negri's statement is true, that transfers were made, there is no evidence to suggest that the transfers of $137,000 conferred any benefit on Friedman himself or more importantly a benefit that it would be inequitable for Friedman to retain – Friedman was not the recipient of the $137,000 (he only received $10,000 as salary for the month of January from First Ascent – incidentally the only salary he took in connection with this entire transaction).  Negri even admitted at his deposition that he did not know what the cash withdrawals were used for (Negri Dep. page 48, line 18-21). And he further admitted that executives of the company were entitled to receive payments – Negri just thought it was strange that payment were made by wire transfer (Negri Dep., page 53, lines 8-11).  Since his deposition, Negri has not provided any additional

evidence to establish why the transfers were made, to whom they were made, and if those transfers conferred a benefit that would be "inequitable to retain." In other words, Negri has provided no evidence to prove any of the elements of his unjust enrichment claim despite the fact that at his deposition Negri stated in regards to the alleged misuse of funds "That's all I can think of now, but I would be happy to get back to you." (Negri Dep. page 53, lines 12-16). Negri never got back to anyone with any additional information.

In another interesting twist, Negri is not claiming that he is entitled to the $137,000 transferred from the company's account – as he is certainly not entitled to those amounts – rather, Negri is claiming that the withdrawals from the Negri Electronics account damaged the company thereby reducing Negri's stock value and that he is entitled to recover that diminution in value.  Discovery is over and Negri has not produced an expert in this case to establish how the payments from the Negri Electronics account reduced the value of his stock and if so, by how much.   Therefore, Negri cannot establish any damage associated with his unjust enrichment claim (by a reduction in the value of his stock) and accordingly, this claim should be dismissed as well.

**IV.   Friedman never entered into a separate personal guaranty agreement, as required by Nevada law and the Statute of Frauds, and accordingly there was no enforceable guaranty between Friedman and Negri.**

Friedman never entered into a guaranty agreement with Negri or any other entity and accordingly, any supposed contract guaranteeing the purchase of Negri Electronics is void under Nevada law.   According to Nevada Revised Statute 111.220: "In the following cases every agreement is void, unless the agreement, or some note or memorandum thereof expressing the consideration, is in writing, and subscribed by the person charged therewith . . . **2.** Every special promise to answer for the debt, default or miscarriage of another."   In Nevada, contracts of

guarantee are subject to the statute of frauds. <u>Pentax Corp. v. Boyd</u>, 111 Nev. 1296, 904 P.2d 1024, (Nev. 1995). The promise to pay the debt of another cannot be enforced unless it is in writing; when so reduced to writing, it becomes, of itself, a distinct contract, and must rest upon its own consideration. <u>Simpson v. Harris</u>, 21 Nev. 353, 31 P. 1009 (Nev. 1893).

Under Nevada law, in order to satisfy the statute of frauds, a contract must contain certain essential elements: "A note or memorandum 'must show on its face or by reference to other writings, first, the names of the parties . . .; second, the terms and conditions of the contract; third, the interest or property affected; and fourth, the consideration to be paid therefor.'" <u>Pentax Corp. v. Boyd</u>, 111 Nev. 1296, 1299, 904 P.2d 1024 (Nev. 1995).

Here, the only reference to any guaranty was in the purchase agreement between First Ascent, LLC and Negri. There was no separate document (or documents) detailing the specifics of the guaranty agreement and in fact, Friedman believed that the guaranty obligation was not being pursued by Negri. There were no documents describing the terms and conditions of the guaranty and the only thing that Negri can point to that even references a guaranty is the one sentence within the purchase agreement referencing the guaranty, yet all other facts and documents demonstrate that no guaranty was ever entered. For example, Negri admits that the only two contracts he entered were the purchase agreement and a subordination agreement (Negri Dep, page 20, lines 10-19) – notably not a guaranty document. Further, the purchase agreement itself is only signed by Friedman on behalf of First Ascent and both Philip and Ryan Negri – there is no space for Friedman to sign as an individual guarantor although there is a space for Philip and Ryan Negri to sign as individual shareholders. In the "Notice" provision of the purchase agreement, once again only First Ascent and the Negri brothers are referenced – again, there is no notice requirement to Friedman as a supposed guarantor. Finally, the purchase

agreement contains a merger clause, which specifically states: "This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understanding of the parties. No supplement modification or amendment of this Agreement shall be binding unless executed in writing by all the parties."

It is important to note that during the negotiation of the purchase agreement, Negri was represented by counsel and also sought the advice of an accountant and an investment banker. If Negri was planning on pursuing the guaranty with Friedman, it was the responsibility of himself and his representatives to ensure that Nevada contract law was complied with and more specifically the Statute of Frauds. From Friedman's perspective, however, because the guaranty was referenced in one sentence but never pursued, Friedman believed the guaranty was abandoned by Negri and it was not discussed further. If that was not the case, it was up to Negri and his counsel to ensure that a separate guaranty agreement was entered containing the required information to ensure the guaranty was enforceable under Nevada law. Because this did not occur, there is no enforceable guaranty contract between Negri and Friedman and accordingly, summary judgment is appropriate on Counts VI and VII.

V.    **Piercing the corporate veil in Nevada requires the presence of "fraud" or "manifest injustice." This is the highest standard for personal indemnification available and Negri has failed to establish any basis to pierce the corporate veil and proceed against Friedman personally.**

Friedman did not engage in any self-dealing or fraud (indeed Friedman and his company, First Ascent lost over $200,000 on the Negri Electronics transaction) and accordingly, there is no basis for Negri to pierce the corporate veil.   Under Nevada Statute 78.747: "Liability of Stockholder, Director or Officer for Debt or Liability of a Corporation:"

**1.** Except as otherwise provided by specific statute, no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation.

**2.** A stockholder, director or officer acts as the alter ego of a corporation if:

**(a)** The corporation is influenced and governed by the stockholder, director or officer;
**(b)** There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; **and**
**(c)** Adherence to the corporate fiction of a separate entity **would sanction fraud or promote a manifest injustice**.

**3.** The question of whether a stockholder, director or officer acts as the alter ego of a corporation must be determined by the court as a matter of law." (emphasis added).

Each of these requirements must be present before the alter ego doctrine can be applied. N. Arlington Med. Bldg., Inc. v. Sanchez Constr. Co., 86 Nev. 515, 471 P.2d 240, 243 (Nev. 1970). "'[T]he corporate cloak is not lightly thrown aside' and the alter ego doctrine is an exception to the general rule recognizing corporate independence." LFC Mktg. Grp., Inc. v. Loomis, 116 Nev. 896, 8 P.3d 841, 846 (Nev. 2000) (per curiam) (quoting Baer v. Amos J. Walker, Inc., 85 Nev. 219, 452 P.2d 916, 916 (Nev. 1969)). Although the provision does not refer to LLCs or their members – and by its terms governs only corporate shareholders and officers, the Nevada Supreme Court has made the assumption without expressly deciding the issue that the provision applies to LLCs as well.  See e.g. Webb v. Shull, 270 P.3d 1266, 1271 n.3 (Nev 2012) (the parties assume that NRS 78.747, which is part of the chapter governing corporations applies to the alter ego assertion against Shull and Celebrate, an LLC.  Accordingly, we likewise assume, without deciding, that the statute applies and analyze their alter ego arguments under that standard).

Here, Negri's attempt to pierce the corporate veil falls short because Negri has not come forward with any evidence demonstrating that Friedman used First Ascent, LLC to engage in any self-dealing or fraud. While First Ascent was a single-member LLC at its inception, the goal was to slowly incorporate additional members into the LLC, including P.J. Louis who was involved in the Negri transaction and served as Negri Electronics CEO after the purchase. By all accounts, First Ascent was a properly formed Delaware LLC, the purpose of which was to acquire companies under one umbrella and use First Ascent as a central vehicle for the growth of the companies acquired. Since its inception in March 2013 – several months before Friedman even knew about Negri or Negri Electronics – First Ascent was involved in purchasing a data center, starting up a "cloud services" division, and negotiating a software development partnership. First Ascent was also actively looking to purchase several other telecom companies to manage and grow prior to the purchase of Negri Electronics. All of these activities by First Ascent were legitimate and Negri has not provided any evidence of fraud – indeed, Negri's complete lack of any evidence of fraudulent behavior is refuted above in Section II. Further, despite Negri's unsupported allegations of self-dealing and fraud, the fact is that Friedman only received $10,000 from First Ascent as salary – Friedman was the Chairman of Negri Electronics after the purchase and sole member of First Ascent – and over the course of this failed transaction, Friedman and his company, First Ascent lost over $200,000. Since all three of the requirements for piercing the corporate veil must be met and Negri cannot establish the third element of fraud, there is no basis to pierce the corporate veil and hold Friedman responsible for any of the claims against First Ascent.

As one final basis that piercing the corporate veil is not available to Negri in this action, the Nevada Statute 78.747 refers to individual liability for "**a debt or liability** of the

corporation." In this case, Negri dismissed all of his claims against First Ascent, LLC and therefore First Ascent, LLC will not have a debt or liability that Friedman can be held responsible for. Negri cannot skip the step of finding liability against First Ascent and simply proceed against Friedman directly – unless the LLC is first responsible. Accordingly, piercing the corporate veil is not available to Negri on this basis either and Negri's claims must be dismissed.

**VI.    By entering into a Subordination Agreement with TCA Negri subordinated all of his claims and rights to pursue Friedman in a lawsuit and accordingly this action must be dismissed.**

Negri entered into a valid agreement with TCA in which he agreed to subordinate his claims and right to pursue Friedman in a lawsuit. Accordingly, Negri does not have standing to pursue this action and all of his claims should be dismissed. In general, standing "consists of both a case or controversy requirement stemming from Article III, Section 2 of the Constitution, and a subconstitutional prudential element. In re AMERCO Derivative Litig., 127 Nev. 196, 213, 252 P.3d 681, 694 (2011) (internal quotations omitted). While "state courts do not have constitutional Article III standing, Nevada has a long history of requiring an actual justiciable controversy as a predicate to judicial relief" Id. (internal quotation omitted). Thus, to pursue a legal claim, an "injury in fact" must exist. Bennett v. Spear, 520 U.S. 154, 167, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997). Specifically, there must be "an invasion of a judicially cognizable interest" that is "concrete and particularized." Id. The injury must also be "actual or imminent," rather than merely conjectural or hypothetical." Id.

Here, Negri lacks standing to pursue any claims against Friedman because he subordinated any and all of his rights to TCA when he signed the subordination agreement.

Negri therefore has not yet suffered any "injury in fact" nor has Negri suffered an "invasion of a judicially cognizable interest." The subordination agreement specifically provided that:

> Until the Senior Debt is Discharged. . . Subordinating Creditors will not demand or receive from Borrower or Ascent, and Borrower and Ascent will not pay to Subordinating Creditors, all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, **lawsuit** or otherwise, nor will Subordinating Creditors exercise any remedy with respect to the Subordinated Debt, or any of the Subordinating Creditor Liens, against any assets or property of Borrower, nor will Subordinating Creditors commence, or cause to commence, prosecute or participate in any administrative, <u>legal</u> or equitable action against Borrower or Ascent.

The Subordinating Agreement further provided that: "This Agreement is a continuing agreement of subordination and shall continue in effect and be binding upon the Borrower, Ascent, and Subordinating Creditors until the Senior Debt is Discharged, or until the Subordinated Debt is paid in full in accordance with the provisions of Section 3 above." Since the Subordination Agreement is still in force and because Negri has no right to affirmatively pursue any claims against Friedman or Ascent, Negri does not have standing to bring his claims and accordingly summary judgment is appropriate dismissing Negri's claims.

## Conclusion

Negri has failed to establish essential elements of each of his claims against Friedman and accordingly, summary judgment is appropriate.  Further, there is no basis to pierce the corporate veil as Negri cannot show that Friedman engaged in any self-dealing or fraudulent behavior. Finally, Negri does not have standing to pursue his claims against Friedman as Negri subordinated his rights to do so in connection with the receipt of some $400,000 in credit. Accordingly, Friedman's motion for summary judgment should be granted and this case dismissed with prejudice.

December 20 2016

By:

Michael J. Friedman
280 Madison Ave, Suite 1005
New York, NY 10016
mjfny@me.com
*Defendant Appearing Pro Se*