Michael J. Friedman
280 Madison Ave, Suite 1005
New York, NY 10016

*Defendant Appearing Pro Se*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RYAN J. NEGRI and PHILIP NEGRI

      Plaintiff,

      vs.

MICHAEL   J.   FRIEDMAN,   ARTHUR
FRIEDMAN and P.J. LOUIS

      Defendants.

Docket No.: 14-cv-10233

Hon. Gregory H. Woods, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___12/20/16___

## STATEMENT OF UNDISPUTED FACTS UNDER FEDERAL RULE 56 AND LOCAL RULE 56.1 IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT MICHAEL J. FRIEDMAN

Michael J. Friedman ("Friedman") hereby submits the following Statement of Material Facts Not in Dispute pursuant to Federal Rule 56 and Local Rule 56.1:

1.      First Ascent, LLC was formed in early March 5, 2013 by Friedman. First Ascent is a Delaware, LLC and Friedman formed First Ascent to use as a vehicle to purchase several companies in the telecom space. The goal was to buy several companies in the telecom space and use First Ascent as a central vehicle for the growth of the companies acquired. (Friedman Dec., para 74; Formation documents, Exhibit H to Friedman Dec.)

2.      Since March of 2013, First Ascent was actively working on purchasing a data center, First Ascent started a "cloud services" division, and was involved in a software development partnership. First Ascent was also actively looking to purchase several telecom companies to manage and grow. (Friedman Dec., para. 75).

3.      First Ascent was also working with network providers to purchase or start its own MVNO (Mobile Virtual Network Operator), which is a wireless communication network provider that does not own the wireless network (an example would be Boost Mobile using Sprint's wireless network). (Friedman Dec., para. 76)

4.      Friedman was the managing member of First Ascent and the intention was to bring on P.J. Louis to come on board as an owner/member as well once things were up and running in the telecom space. (Friedman Dec., para 77).

5.      In the Fall of 2013, Friedman's company, First Ascent, LLC, was looking for a company to acquire via seller financing and for Paxton "P.J." Louis ("Louis") to be CEO and to operate such company. (Friedman Dec., para. 3).

6.     At that time, Friedman met Todd Sherman ("Sherman"), an investment banker in New York, New York who introduced him to Negri and discussed Negri's company Negri Electronics, Inc. (the "Company"). (Friedman Dec., para. 4).

7.     After the introduction and brief discussion, Friedman, on behalf of First Ascent, had a more formal teleconference with Negri, Sherman and Louis to discuss the potential sale of the Company. (Friedman Dec., para. 5)

8.     During the teleconference, Negri provided Friedman and Louis, on behalf of First Ascent, information about the history of the Company, the current financial state of the company, and the future prospects for the Company.  Negri provided this information to First Ascent as a way to entice it to pursue the purchase of the Company.  (Friedman Dec., para. 6; Negri emails related to history of company Exhibit A to Friedman Dec; Then-current financials of the Company provided in October 2013, Exhibit B to Friedman Dec).

9.     After the teleconference, on or about October 16, 2013, Negri and First Ascent entered into a Non-Disclosure Agreement ("NDA") and Negri, through Sherman sent a "due diligence package" to First Ascent that included: business plans, tax returns, supplier information, lawsuit information, financials, bank account information for five separate accounts, an organizational chart, and other Company details. (Friedman Dec., para. 9; Due Diligence Package, Exhibit C to Friedman Dec).

10.     First Ascent reviewed the information provided by Negri and followed up with several telephone calls to discuss the information and additional information needed to assess the opportunity. (Friedman Dec., para. 11).

11.     Over the course of the next few weeks, Negri sent multiple versions of the Company's financial statements and each time the net income was increased. (Friedman Dec., para. 12).

12.     At the same time that First Ascent was performing due diligence on the Company, First Ascent was also discussing and preparing a potential business plan and corporate strategy for the Company should the sale actually take place. (Friedman Dec., para. 13).

13.     On December 17, 2013, Louis and Friedman, on behalf of First Ascent, traveled to Nevada to meet with Negri, inspect the warehouse, meet the employees and warehouse staff, and conduct employee interviews. (Friedman Dec., para. 14).

14.     After the in-person meeting in Nevada, Negri, First Ascent continued negotiating the terms of the agreement to purchase the Company and a **separate** consulting agreement that would require Negri to continue on as a consultant for the first year after the purchase closed. (Friedman Dec., para. 15; Negri Dep., page 25, lines 9-12, Exhibit F to Friedman Dec).

15.     The reason that First Ascent insisted Negri remain as a consultant was to ensure a smooth transition of the company and to continue to take advantage of Negri's work as a salesman, which had accounted for at least two-thirds of the company sales.  First Ascent knew that it would take time to get his sales force in place after the sale closed and accordingly, Negri's obligation and promise to serve as a consultant was critical to the sale transaction. (Friedman Dec., para. 16).

16.     In addition to the separate consulting agreement with Negri, the concept of Friedman guaranteeing the purchase of the Company was also discussed, and a provision was actually put into the agreement referencing the guaranty. (Friedman Dec., para. 17).

17.     Despite the discussions regarding the guaranty however, Friedman never actually entered into a separate guaranty agreement and the purchase transaction of the Company went forward without a separate guaranty agreement.  (Friedman Dec., para. 18).

18.     It was Friedman's understanding that the parties were abandoning any guaranty obligations from Friedman as the matter was not pursued. (Friedman Dec., para. 19).

19.     In fact, during discovery, when asked to produce any documents concerning or relating to the guaranty of the purchase agreement, Friedman responded as follows: "Defendant has no documents responsive to this request." (Friedman's responses to Document Production Requests, Exhibit I to Friedman Dec).

20.     During the negotiation process, First Ascent agreed that for the last month of operations, Negri could keep half of the cash that remained in the Company bank accounts.  For example, if the Company accounts had $500,000 in cash at the time of closing, Negri would be entitled to keep $250,000. (Friedman Dec., para. 20; Negri Dep., page 34, lines 3-7, Exhibit F to Friedman Dec).

21.     This agreement was contingent upon Negri's good faith operation of the Company during the last months leading up to the close, including the obligation for Negri to continue paying Company bills and vendor invoices as they came due. (Friedman Dec., para. 21).

22.     To First Ascent's surprise, during the last months of operation prior to the sale, Negri boosted the amount of cash in the operating accounts **by neglecting to pay numerous Company bills**, including vendor and supplier bills.  (Friedman Dec., para. 22).

23.     In fact, by February of 2014, Friedman learned that Negri had failed to pay several vendors – including Titan Enterprises and Secure enterprises – since at least October of

2013, with outstanding invoices totaling over $109,000 – which was prior to the time that Negri began negotiations with First Ascent. (Friedman Dec., para. 23; Titan and Secure Enterprises emails, Exhibit D to Friedman Dec).

24.     This tactic by Negri increased the amount that Negri was to receive as part of the sale, but left the Company in a very precarious situation with vendors and suppliers owed significant funds. (Friedman Dec., para. 25).

25.     Negri tried to move the negotiations forward as fast as possible and pushed for the closing to take place before December 30, 2013, in order to ensure that the closing could be attributed to the Company's 2013 fiscal year. (Friedman Dec., para. 26).

26.     Negri also insisted that no money be transferred until January 2014 so that Negri could complete his move from California to Nevada in order to avoid paying California income taxes on the sale transaction. (Friedman Dec., para. 27).

27.     This information did not seem relevant at the time, but later (in or around January/February 2014) made sense when the Company's accountant and bookkeeper informed Louis, the then CEO of First Ascent, that Negri had a history of routinely shredding tax documents from the State of California. (Friedman Dec., para. 28).

28.     On December 24, 2013, in accordance with Negri's rapid timeframe, the Purchase Agreement was signed. (Friedman Dec., para. 29; Purchase Agreement, Exhibit E to Friedman Dec).

29.     The Purchase Agreement included a "merger clause" at Section 9(b) which provided that: "This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understanding of the parties. No supplement modification or amendment of

this Agreement shall be binding unless executed in writing by all the parties." (Exhibit E to Friedman Dec.).

30.     Also, the Purchase Agreement specifically stated that the governing law of the agreement is the laws of the State of Nevada. (Purchase Agreement, Sec. 9[j], Exhibit E to Friedman Dec.)

31.     Further, in the "Notice" section, Michael Friedman the individual (or as guarantor as argued by Negri) is **not** included as an entity to receive notice.  The only entities that are required to receive notice are First Ascent, LLC, Shareholders, Ryan Negri and Philip Negri and the escrow agent. This further evidences the fact that Friedman was never actually included as a guarantor of the agreement despite the preliminary discussions. (Purchase Agreement, Sec. 9[k], Exhibit E to Friedman Dec.)

32.     The Purchase Agreement also included an attorney's fees provision which stated that: "in the event any action is brought to enforce this Agreement, the prevailing party shall be entitled to recover its costs of enforcement including, without limitation, attorney's fees and court costs." (Purchase Agreement, Sec. 9[n], Exhibit E to Friedman Dec.)

33.     The Purchase Agreement also discussed the "construction" of the agreement and stated that: "this agreement and any documents or instruments delivered pursuant hereto shall be construed without regard to the identity of the person who drafted the various provisions of the same.  Each and every provision of this Agreement and such other documents and instruments reflects a negotiated outcome and as such shall be construed as though the parties participated equally in the drafting of the same.  Any rule of construction providing that a document or provisions be construed against the drafting party shall not be applicable to this agreement or

such other documents and instruments." (Purchase Agreement, Sec. 9[p], Exhibit E to Friedman Dec.)

34.     Finally, the signature page of the Purchase Agreement only required First Ascent, Ryan Negri and Philip Negri (on behalf of Negri Electronics) and Ryan Negri and Philip Negri (on behalf of the selling shareholders) to sign the agreement.  Michael Friedman as a supposed guarantor was not obligated to sign the Purchase Agreement and as noted above, no guaranty agreement was ever entered into between the parties.  (Purchase Agreement, Exhibit E to Friedman Dec.)

35.     On December 25, 2013, Negri, Louis, and Friedman on behalf of First Ascent were working on a press release to be sent to the staff, the vendors, and the general public to announce the sale of the Company.  (Friedman Dec., para. 30).

36.     The press release was sent on December 31, 2013 by Negri. (Id.)

37.     In January 2014, Louis and Friedman (now acting on behalf of Negri Electronics) proceeded to hire salesmen, contact vendors, and establish relationships.  Internally, Friedman and Louis, set up corporate policies and procedures, changed insurance, and performed other organizational tasks to try and ensure that the transfer of ownership was as smooth as possible. (Friedman Dec., para. 31).

38.     It was at this time in January, that Friedman learned for the first time that the Company was completely disorganized.  (Friedman Dec., para. 32).

39.     There were no internal controls or procedures for the employees and there were no policies or guidelines in place for the purchase and sale of products despite the fact that Negri had represented in his business plan that all off this was in place. (Friedman Dec., para. 33).

40.     When queried on the policies and procedures, the typical response from Company employees was "ask Ryan [Negri]." This reaffirmed for Friedman the importance of Negri remaining in place as a consultant and the separate consulting agreement was even more critical. (Friedman Dec., para. 34).

41.     When employees were queried on why there was a plethora of missing documentation and information, such as why there were 5 bank accounts, and why many personal expenses and other personal bills were paid, the typical answer from employees was, "Ryan would not tell us and handled that".  (Friedman Dec., para. 35).

42.     When the Company's own CPA was told by Louis that we wanted to perform an internal audit to try and understand how the books and records were kept and understand the details of the Company, the CPA then stopped speaking with Louis and would not provide Louis with any assistance or information. (Friedman Dec., para. 36).

43.     In January 2014, Friedman also learned for the first time that the Company itself was way more starved for cash than Negri had lead on during the negotiation of the deal and it became clear that the financials provided by Negri were inaccurate.  (Friedman Dec., para. 37).

44.     The revenue in January was also way lower than anticipated and this coupled with the fact that Negri had failed to pay vendors and suppliers for over two months prior to the sale, stifled the Company's supply pipeline and allowance for credit with its vendors.  (Friedman Dec., para. 38).

45.     The Company began to look like a ponzi scheme, in which Negri was generating new sales (and losing money on such sales) in order to pay for older bills and for his personal lifestyle (which included driving a brand new Tesla) and purchasing a $1.5 Million dollar home. (Friedman Dec., para. 39).

46.    Purchasing on credit is critical in this industry as often times the Company would purchase a large number of phones on credit and ultimately pay back the vendor through the sale of the phones. (Friedman Dec., para. 40).

47.    Because of Negri's failure to pay vendors and suppliers, by the beginning of February, the Company's vendors started refusing to extend credit to the Company, which meant that in order to secure inventory, the Company would have to pay in cash and upfront, which was not possible given the Company's – Negri-caused – cash strapped position. (Friedman Dec., para. 41).

48.    Friedman still believed in the new management and that although sales were dropping, with the line of credit that was being negotiated, this would provide key financial support to give the Company some credit from its vendors. (Friedman Dec., para. 42).

49.    Because of Negri's refusal for over one month to sign and allow the Company to receive this necessary line of credit, and because of Negri's failure to pay vendors and suppliers and their refusal to extend credit because of Negri, the Company's sales and ability to deliver on its online sales stopped. (Friedman Dec., para. 43).

50.    This put the Company in a downward spiral; which could have been avoided had Negri not intentionally held up the Company's receipt of the line of credit. (Friedman Dec., para. 44).

51.    It was also clear that the key to essentially all of the Company's revenue was Negri himself and that despite claiming that he had a sales force in place, he was the only one making any sales. Negri essentially would be on the phone every day selling phones as opposed to running the actual Company. (Friedman Dec., para. 45).

52.     The final nail in the Company's coffin was Negri refusing to remain in place as a consultant despite the fact that he agreed to do so for one year following the closing. (Friedman Dec., para. 46).

53.     By the beginning of February, Negri informed Freidman that he would no longer work as a consultant for the Company. This left the Company in dire straits as Negri had accounted for over two-thirds of Company revenue and his refusal to remain with the company resulted in a dramatic and ultimately fatal decrease in revenue over time. (Friedman Dec., para. 47).

54.     In a last ditch attempt to save the company, Louis, Friedman, and Rick Landry (the then head of sales hired by me in January 2014) proceeded to search for other sources of revenue – including the potential acquisition of other electronics companies – and other means of financing in order to keep the Company afloat. (Friedman Dec., para. 48).

55.     Friedman was doing everything he possibly could to save the company, despite Negri's creating constant roadblock's and hurdles. (Friedman Dec., para. 49).

56.     In fact, Friedman was able to secure a $400,000 line of credit of a credit facility up to $3,000,000 so that the Company could purchase inventory and remain operational; however due to Negri's refusal to sign the documentation for over 4 weeks, the Company's ability to purchase inventory and generate revenue (when coupled with Negri's refusal to remain as a consultant and generate sales) crippled the Company. (Friedman Dec., para. 50; Negri Dep., page 35, lines 10-12).

57.     Friedman had also secured an additional $150,000 to infuse into the company in February and March of 2014 and an additional $50,000 in April and May – all to no avail. (Friedman Dec., para. 51).

58.    Friedman's sales team (despite not being able to purchase inventory) had been negotiating with several large company's and was providing quotes to the tune of several million dollars to a Fortune 100 Company.  In addition, Louis was speaking with his industry contacts and the Company was discussing performing selling to, as well as warehousing inventory for one of the top three telecommunications companies in the USA. (Friedman Dec., para. 52).

59.    As part of Friedman's last ditch efforts to save the Company, in May 2013 Friedman hired a highly experienced Consulting Chief Financial Officer, who had over 25 years experience in finance, restructuring, financing and complex transactions.  (Friedman Dec., para. 53).

60.    In July and August 2014, Friedman's executive team (including seasoned CEO, CFO, VP of sales and the Company's law firm) negotiated with investment bank(s) and a private equity fund, and even attempted to structure a deal to put the Company into a public vehicle in order to raise capital, give creditors (including Negri) an option to liquidate some of their holdings and debt, and in order to help secure funding, and to provide the Company with another avenue to negotiate with potential funding sources. (Friedman Dec., para. 54).

61.    Friedman also had the Company, which had previously been provided with a $400,000 portion of a $3,000,000 credit facility, interested in further extending an additional $250,000 to the Company in order to save it, but Negri's initial refusal to negotiate, and then attempt to have Friedman agree to the funding provided that he violate the terms of the existing line of credit in order to pay Negri, further solidified Negri's attempts to put the Company out of business and put his personal interests ahead of his duties as a Board of Director Member. (Friedman Dec., para. 55).

62.     In additional to all of these efforts, Freidman also tried to start new lines of business, such as offering cloud services to customers, but this was not successful, due to the distractions caused by Negri's multiple and continual attempts to put the Company out of business. (Friedman Dec., para. 56).

63.     Louis and Landry also talked to various Fortune 500 companies to have them become corporate vendors – i.e. to sell phones and other products. (Friedman Dec., para. 57).

64.     Despite all of the attempts to save the Company, by June of 2014, the Company had no more inventory, no more credit, and was for all intents and purposes could no longer operate. Still, Friedman continued to negotiate with potential acquisitions, acquirers and funders in order to save the Company. (Friedman Dec., para. 58).

65.     Negri, on the other hand, would not negotiate and would not move on his position to be paid what he believed he was owed, putting his personal interests ahead of the Company and of saving the Company and its employees. (Friedman Dec., para. 59).

66.     Negri had no interest in helping save the Company.  Negri would not hear any of the funding ideas, and would not even discuss any potential mergers with a public company, which would have potentially provided the Company with new avenues to find funding and save the Company, as well as giving Negri an opportunity to sell his shares in the market and liquidate his position in the Company. (Friedman Dec., para. 60).

67.     Friedman had frequent conference calls with his seasoned executive team in order focus on putting together recovery plans, identify areas of improvement, and to preserve and grow the corporation.  (Friedman Dec., para. 61).

68.     On or about July 2014, Friedman and the Company's executive team met with an investment bank to help the Company raise and/or find capital. (Friedman Dec., para. 62).

69.     On or about July/August 2014, the Company met with a private equity firm to purchase control of or to be a secured creditor for the Company.  Such negotiations stalled, as the Company's financial position required it to shut down and Negri's refusal to cooperate or negotiate to buy the private equity firm time to fully grasp the transaction and Friedman's ultimate growth plan. (Friedman Dec., para. 63).

70.     Given the disorganized state of the Company, the lack of sales force, and the lack of cash flow, at the time Negri and Friedman were negotiating the sale, the Company was clearly a sinking ship and a ponzi scheme in disguise.  (Friedman Dec., para. 64).

71.     Negri was apparently trying to get out of the Company before it was too late and accordingly, Negri misrepresented important details of the Company during the negotiations with (now acting on behalf of Negri Electronics), including the sales, net income, and most importantly the cash flow, in order to entice First Ascent to enter the purchase contract.  Negri also left the company cash strapped by failing to pay vendors leading up to the closing date, which destroyed the Company's ability to purchase on credit.  (Friedman Dec., para. 65).

72.     Had First Ascent known the true state of the Company and Negri's actual intentions to squeeze every last dime out of the Company prior to the sale, it never would have entered into the purchase agreement. (Friedman Dec., para. 66).

73.     After Negri's deal with First Ascent failed, Negri filed a complaint in the Southern District of New York alleging claims for Fraudulent Misrepresentation, Unjust Enrichment, Breach of Contract.  (Friedman Dec., para. 67)

74.     The complaint was subsequently amended and re-filed on April 8, 2015 at which time Negri added claims for violation of the New York Debtor Creditor law as well as a second

count for breach of contract. (Friedman Dec., para 68; First Amended Complaint Exhibit F to Friedman Dec.)

75.     Various claims and parties were dismissed and the only remaining claims are: Count I for Fraudulent Misrepresentation, Count II and III for violations of the New York Debtor Creditor Law, Count IV for Unjust Enrichment, and Count VI and VII for Breach of Contract. (Friedman Dec., para. 69; First Amended Complaint Exhibit F to Friedman Dec.)

76.     The parties engaged in discovery on all of Negri's claims and on September 26, 2016 Negri was deposed.

77.     During the deposition, Negri admitted that during the negotiations for the purchase and sale of the Company, Negri retained an external attorney, Tom Lamons from Cummins & White, as well as an accounting firm. (Negri Dep., page 11, line 23 through page 12, line 11; page 20, lines 3-6, Exhibit G to Friedman Dec.).

78.     Negri also discussed the sale of the Company with Todd Sherman, who was an investment banker. (Negri Dep., page 13, line 6 through 12, Exhibit F to Friedman Dec). In fact, Negri was introduced to First Ascent through Todd Sherman (Negri Dep, page 15, line 20-21; 16 lines 5-15), Exhibit F to Friedman Dec) and it was Todd Sherman that advised Negri to close the acquisition with First Ascent.  (Negri Dep., page 54, lines 22-24).

79.     During the deposition, Negri also admitted that the **only** two agreements entered into between the parties was the Purchase Agreement and a Consulting Agreement – no other agreements were signed that day. (Negri Dep, page 20, lines 10-19).

80.     Negri also admitted that several months after the closing, he also signed a subordination agreement and an amendment to the original purchase agreement.  (Negri Dep.,

page 35, line 23 through page 36, line 2). A lawyer assisted Negri in the negotiations of the subordination agreement. (Negri Dep., page 36, lines 6-19).

81. After First Ascent allegedly defaulted on the purchase agreement, Negri had the right to take the company back; however, Negri chose not to do so. (Negri Dep, page 44, lines 9-13).

82. Negri admitted during his deposition that he believed the Company's money was misused. When asked to clarify, Negri could only point to certain withdrawals of money from the Company's bank account. Negri admitted however, that he did not know what the withdrawals were used for, only that there were withdrawals. (Negri Dep., page 48, lines 3-21).

83. When asked at deposition what statements were made to Negri that weren't true, Negri stated: "specifically the wealth of the executive of First Ascent, promising and never furnishing documents, promises to run the company locally as opposed to absentee. (Negri Dep. page 49, lines 1-21). Other than the above statements, Negri could not point to any other misstatement or alleged misrepresentations by First Ascent or Friedman.

84. Several months after the purchase of transaction closed, Negri entered into a subordination agreement with TCA Global Credit Master Fund, LP. (Friedman Dec., para 75).

85. The purpose of the subordination agreement was for Negri Electronics to secure a line of credit with TCA so that Negri Electronics could receive $400,000 and pay for inventory and to help grow the company. The maximum credit limit with TCA was $3,000,000. (Friedman Dec., para. 76).

86. As part of the agreement and the receipt of credit from TCA, Negri agreed to subordinate all of his rights and claims to TCA.(Friedman Dec., para. 77; Subordination Agreement, Exhbit H to Friedman Dec.)

87.     Specifically, the subordination agreement provided in Section 3 that:

"No Payments or Enforcement." Until the Senior Debt is Discharged, and except only as expressly provided below, Subordinating Creditors will not demand or receive from Borrower or Ascent, and Borrower and Ascent will not pay to Subordinating Creditors, all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, **lawsuit** or otherwise, **nor will Subordinating Creditors exercise any remedy with respect to the Subordinated Debt, or any of the Subordinating Creditor Liens, against any assets or property of Borrower, nor will Subordinating Creditors commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against Borrower or Ascent**.

88.     The subordination agreement went on to state at Section 9(b) "Certain Agreements of Subordinating Creditors" that:

No Interference. Subordinating Creditors acknowledge that Borrower has granted to TCA security interests in all of the Collateral, and agree not to interfere with or in any manner oppose a disposition of any Collateral by TCA in accordance with applicable law and the terms of the Credit Agreement and other Loan Documents, as may be necessary or required to fully Discharge the Senior Debt.

89.     Finally, the subordination agreement at Section 12(a) and (b) "Miscellaneous" provided that:

(a) Subrogation. Subordinating Creditors hereby agree that until the Senior Debt is Discharged, they shall waive any claims and shall not exercise any right or remedy, direct or indirect, arising by way of subrogation or otherwise, against the Borrower or Ascent.

(b) Continuing Agreement. This Agreement is a continuing agreement of subordination and shall continue in effect and be binding upon the Borrower, Ascent, and Subordinating Creditors until the Senior Debt is Discharged, or until the Subordinated Debt is paid in full in accordance with the provisions of Section 3 above. The subordinations, agreements, and priorities set forth herein shall remain in full force and effect regardless of whether any party hereto in the future seeks to rescind, amend, terminate, or reform, by litigation or otherwise, its respective agreements with the Borrower or Ascent.

December 20, 2016                     By: _____

                                          Michael J. Friedman
                                          280 Madison Ave, Suite 1005
                                          New York, NY 10016
                                          mjfny@me.com
                                          *Defendant Appearing Pro Se*